1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

EDWIN B. CARTON et al.,                    )
                                           )
              Plaintiffs,                  )
                                           )
       v.                                  )          2:11-cv-746-RCJ-PAL
                                           )
                                           )          **ORDER**
B&B EQUITIES GROUP, LLC et al.,            )
                                           )
              Defendants.                  )
                                           )
_____   )

       This case involves a stranger-originated life insurance scheme, in which the plaintiffs "loaned" money to pay the premiums on seven life insurance policies of six wealthy individuals. In their first amended complaint ("FAC"), the plaintiffs claim they were not aware this arrangement was against public policy and now seek to have the policies declared void ab initio and the premiums returned.  Defendant American General Life Insurance Company ("American General") has filed a motion to dismiss (#55) as has Defendant Aviva Life and Annuity Company ("Aviva") (#90).  The plaintiffs have also filed a motion to dismiss certain counterclaims, a motion to strike unsigned pleadings, and a motion for entry of default (#62). Finally, Defendants Samuel Diggle and the Samuel L. Diggle Irrevocable Life Insurance Trust—respectively an insured party and a beneficiary under the arrangement—have filed a motion to dismiss the FAC (#102).  For the reasons stated below, the Court grants American General's motion to dismiss (#55) and Aviva's motion to dismiss (#90);  Diggle's motion to dismiss is denied (#102); and the plaintiffs' motion to dismiss, strike, and for entry of default (#62) is granted in part and denied in part.

**BACKGROUND**

Stranger-originated life insurance ("STOLI") arrangements have become increasingly common over the past decade. *See Sun Life Assurance Co. of Canada v. Berck*, 770 F.Supp.2d 728, 729-30 (D. Del. 2011). In a typical STOLI scheme, a speculator collaborates with an elderly individual who has a high net worth in obtaining a life insurance policy on the life of the wealthy individual. *See generally* 3 LEO MARTINEZ ET AL., NEW APPLEMAN INSURANCE LAW PRACTICE GUIDE § 34.09[3] (2011). The wealthy individual is often promised cash upon the future sale of the policy or enticed to enter the arrangement through the promise of two years of free life insurance. The speculator provides non-recourse financing to purchase the policy—secured by the policy—which comes due after the two-year contestability period in which the insurer has to challenge the policy has run. If the insured dies within the two-year contestability period, the speculator is repaid plus interest out of the proceeds of the policy. If the insured survives the two-year contestability period, then there are two ways he or she may repay the speculator. First, the insured may pay the outstanding debt and accrued interest and retain the policy. This option is generally less attractive because the interest rates are often high or because the insured was promised a portion of the proceeds upon the sale of the policy. The second option is the insured may transfer the policy to the speculator to satisfy the debt, and the speculator may then sell the policy on the secondary market. These arrangements ultimately amount to unlawful wagering and have generally been disfavored by courts. *See Berck*, 770 F.Supp.2d at 730.

Plaintiffs Edwin and Lonnie Carton were first introduced to STOLI transactions by Defendant Bruce Plotnick, whom they met at a financial planning seminar in the early to mid 2000's. (FAC (#43) at 12). Plotnick was the featured lecturer at the seminar and is the principal employee and owner of Defendant Estate Planning Solution Network ("EPSN"). (*Id.* at 7). Plotnick suggested the Cartons invest their retirement funds in a concept called "premium financing" through Defendant Robert Koppel ("R. Koppel"). (*Id.*). Plotnick and R. Koppel told the Cartons that B&B Equities ("B&B"), a Nevada limited liability company whose managing members are Defendants R. Koppel and Robert Eberle, would organize limited

2

1    liability companies which would be assigned the rights to the life insurance policies of the

2    insured third-parties and would assume the liabilities in funding the policies.  (*Id.* at 13).  The

3    Cartons were then informed they would receive an ownership interest in these limited liability

4    companies and were guaranteed a return of 20% on their investment.  (*Id.*).  The Cartons were

5    also told that the insurance premiums would be paid by the limited liability companies for a two

6    year period, after which they would be repaid in one of two ways: (1) the insured keeps the

7    policy and pays off the loan with interest, or (2) the insured sells the policy on the secondary

8    market.  (*Id.* at 10).  The Cartons allege they were under the impression that this type of

9    transaction was legal and that the insurance company would have full knowledge of the

10   arrangement.  (Opp'n to Mot. to Dismiss (#113) at 9).

11       On July 16, 2008, the Cartons invested $700,000 with B&B through Plotnick and R.

12   Koppel.  (FAC (#43) at 14).  The investment was spread over seven insurance policies

13   (collectively "the Policies") which insured six individuals (collectively "the Insured").  (*Id.* at 17).

14   Three of the Policies were through American General and insured Defendants Thomas E.

15   Colbert, Wanda D. Dean, and Kenneth D. Huntley.  (*Id.*).  Thomas Colbert is a resident of

16   Nevada, Wanda Dean is a resident of California, and Kenneth Huntley is a resident of Iowa.

17   (*Id.* at 7-8).  Three of the Policies were through Aviva, and insured Defendants Kenneth D.

18   Huntley, Leon E. Dean, and Samuel L. Diggle.  (*Id.* at 17).  Leon Dean is a resident of

19   California and Samuel Diggle is a resident South Carolina.  (*Id.* at 7-8).  The final policy was

20   through Americo and insured Defendant Gloria Diaz Rivera, a resident of Puerto Rico.  (*Id.* at

21   8, 17).  The face amount of these policies ranged from $600,000 to $3,000,000.  (*Id.* at 17).

22   The beneficiaries of the Policies were irrevocable life insurance trusts which bore the name

23   of the Insured  (ex: the Kenneth D. Huntley Irrevocable Life Insurance Trust) (the "ILITs").  (*Id.*

24   at 8, 18).  The Insured served as trustee for each of their respective ILITs.  (*Id.* at 19).

25       On the American General applications for life insurance, the Insured failed to answer

26   the question which asked for information on the "Premium Payor" if it was different from the

27   policy owner, even though a third party was providing financing for the policy.  (FAC (#43) at

28   26-28).  On the Aviva applications for insurance, the Insured failed to inform Aviva of the

1    premium financing arrangement. (*Id.*).

2            Promissory notes were signed by the Insured in their capacity as trustee of their ILITs

3    promising to repay the loans obtained from the Cartons and agreeing to an interest rate of

4    20% per annum on those loans. (*Id.*).  This amount became payable either: (a) the day

5    following the two year anniversary of the note; (b) the date of the death of the insured; (c) the

6    date of any breach; or (d) the date of any default. (*Id.* at 20).  Limited liabilities companies

7    were created which bore the name of the Insured (Plaintiffs Kenneth Huntley II, LLC, Leon

8    Dean II, LLC, Gloria Diaz II, LLC, Thomas Colbert V, LLC, Wanda Dean II, LLC, and Samuel

9    Diggle II, LLC) (the "LLCs") and the Insured executed a collateral assignment, which assigned

10   and pledged the insurance policies to the LLCs as collateral to secure the loan. (*Id.* at 21).

11   The Cartons obtained an interest in the LLCs reflecting the percentage of the funding they

12   provided, and in August 2008 received a package of documents which included the insurance

13   application for each policy, the secured promissory note, the collateral assignment, and other

14   relevant documents. (*Id.* at 16, 25).

15           The loans were all set to expire between June and September of 2009. (*Id.* at 27-29).

16   However, in July of 2009, the Cartons received letters informing them that additional investors

17   were brought in to pay a third year of premiums on four of the Policies, thus decreasing the

18   Cartons' percentage interest in the Policies. (*Id.* at 25-26).  None of the Policies were sold and

19   apparently all of the policies have since lapsed for non-payment. (Mot. to Dismiss (#90) at 5).

20   The Cartons never received their principal or the guaranteed interest on their investment.

21   (FAC (#43) at 26-30).

22            The Cartons filed suit on behalf of themselves and the LLCs on May 10, 2011 against

23   B&B, Global Equity Preservation, Inc. ("Global Preservation"); Global Equity Resources, LLC

24   ("Global Resources"); Eagle Investment Corporation of America; Pro Financial Group, Inc.

25   (also registered under the name Pro Fi Group); R. Koppel; Robert Eberle; Steve Koppel (a

26   shareholder and officer of B&B) ("S. Koppel"); EPSN; Bruce Plotnick;  the Insured; the ILITs

27   who were named as beneficiaries of the Policies; Aviva; American General and Americo

28   Financial Life and Annuity Insurance Company, among others. (Compl. (#1)).  The Cartons

                                                    4

allege Defendants B&B, Global Preservation, Global Resources, Eagle Investment, and Pro Financial Group are alter-egos of one another and operate under common ownership. (FAC (#43) at 5). The FAC was filed on July 12, 2011 and includes fourteen causes of action: (1) federal securities fraud; (2) declaratory relief and rescission of the Policies; (3) declaratory relief for refund of the premiums; (4) state securities fraud; (5) actual fraud; (6) constructive fraud; (7) breach of the investment agreements; (8) breach of the loan documents; (9) foreclosure of the Policies; (10) unjust enrichment; (11) injunctive relief; (12) breach of fiduciary duty; (13) deceptive trade practices; and (14) professional negligence. (*Id.* at 34-46).

American General filed a motion to dismiss (#55) on July 28, 2011, and Aviva filed a motion to dismiss (#90) on August 2, 2011. American General and Aviva (collectively, the "Insurers") both claim the FAC should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). (Mot. to Dismiss (#55) at 2; Mot. to Dismiss (#90) at 3). The Insurers argue the Cartons lack standing to bring the claims against them because they were not parties to the insurance contracts, they are not the third-party beneficiaries of the contracts, and the contracts have lapsed. (Mot. to Dismiss (#55) at 11-12; Mot. to Dismiss (#90) at 11-13). The Insurers argue the Cartons have also failed to state a claim against them because the Policies have been terminated and the Cartons have unclean hands due to their participation in the fraud. (Mot. to Dismiss (#55) at 17-28; Mot. to Dismiss (#90) at 15-18). Of the claims brought in the FAC, the only causes of action applicable to the Insurers are those for: (a) declaratory relief and rescission of the Policies (claim two); (b) declaratory relief and refund of premiums (claim three); (c) unjust enrichment (claim ten); and (d) injunctive relief (claim eleven).

The Cartons filed a motion to dismiss, strike, and for entry of default (#62) on August 1, 2011. They contend Defendants Eberle, R. Koppel, S. Koppel, B&B, Global Resources, Pro Financial, and Pro Fi all submitted an "Answer and Counterclaim" but no counterclaims were set forth in the pleadings and the pleadings were not signed. (Mot. to Dismiss, Strike, Entry of Default (#62) at 4-5). They argue these counterclaims should be dismissed for failure to state a claim, and in the alternative move for a more definite statement. (*Id.* at 4).

1    Additionally, the Cartons argue that these unsigned pleadings should be dismissed under Fed.

2    R. Civ. P. 11(a).  (*Id.* at 4-5).  Finally, the Cartons note that Defendants EPSN, Pro Fi, Pro

3    Financial, B&B, Global Resources and the Kenneth D. Huntley ILIT are artificial entities and

4    have appeared without licensed legal counsel.  (*Id.* at 5).  Because  unnatural entities must

5    be represented by counsel, the Cartons argue a default judgment should be entered against

6    these Defendants.  (*Id.* at 5-6).  None of the Defendants against whom this motion was

7    brought filed a response and none of them appeared at the hearing on November 8, 2011.

8        On September 9, 2011 Defendants Samuel Diggle and the Samuel L. Diggle  ILIT filed

9    a motion to dismiss the FAC for lack of subject matter jurisdiction.  (Mot. to Dismiss (#102)).

10   Diggle chiefly argues that none of the federal claims in this action are directed against him and

11   the federal claims are unrelated to the claims that are in fact directed against him, and

12   therefore the Court lacks subject matter jurisdiction over the claims against Diggle.  (*Id.* at 4-7).

13                                              **DISCUSSION**

14   **I.    The Insurers' Motions to Dismiss**

15          **A.    Lack of Subject Matter Jurisdiction**

16                 **1.    Legal Standard**

17          The absence of standing is properly raised in a Rule 12(b)(1) motion because standing

18   is a limitation on the court's subject matter jurisdiction.  *Thornhill Publ'g Co. v. Gen. Tel. &*

19   *Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).  The United States Constitution limits the

20   jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.

21   "[T]he core component of standing is an essential and unchanging part of the case-or-

22   controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

23   (1992).  Federal courts consequently lack jurisdiction over a claim if the plaintiff lacks standing

24   to bring it.

25          Under Article III, there are three foundational elements of standing.  The plaintiff must

26   plead (1) that she has suffered an actual or imminent injury in fact to a legally-protected

27   interest, (2) that there was a causal connection between her injury and the conduct

28   complained of, and (3) that her injury is likely to be redressed by a favorable decision.  *Lujan*,

504 U.S. at 560-61; *Davis v. Yageo Corp.*, 481 F.3d 661, 673 (9th Cir. 2007).  In addition to these Article III elements, certain prudential requirements for standing must also be met with regard to each respective claim asserted in a complaint.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352-53 (2006); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984).  "[P]rudential standing concerns require that [the court] consider . . . whether the alleged injury is more than a 'mere generalized grievance,' whether the plaintiff is asserting her own rights or the rights of third parties, and whether the claim 'falls within the zone of interests to be protected or regulated by the constitutional guarantee in question.' "  *Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840, 848-49 (9th Cir. 2007) (citations omitted).  If any plaintiff fails to meet any of these requirements, the court lacks jurisdiction over that claim and it may be dismissed under Rule 12(b)(1).

Jurisdictional attacks based on Rule 12(b)(1) may be facial or factual.  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  When the attack to jurisdiction is factual, the district court may review evidence beyond the complaint without converting the motion into a motion for summary judgment, and without presuming the truthfulness of the plaintiff's allegations.  *Id.*  The non-moving party has the burden of introducing evidence to defeat the factual attack asserted by the movant.  *Wright v. Incline Village Gen. Improvement Dist.*, 597 F.Supp.2d 1191, 1199 (D. Nev. 2009)*; Frasure v. United States*, 256 F.Supp.2d 1180, 1184 (D. Nev. 2003).  In considering a factual attack under Rule 12(b)(1), "no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court form evaluating for itself the merits of the jurisdictional claims."  *Wright*, 597 F.Supp.2d at 1199 (quoting *Thornhill Publ'g Co.*, 594 F.2d at 733).

### 2.    Analysis

The Cartons offer two arguments as to why they have suffered an injury and fact and thus have standing to sue.  First, the Cartons argue that they have an interest in the Policies because the Policies were pledged to them under the collateral assignments.  (Opp'n to Mot. to Dismiss (#76) at 16; Opp'n to Mot. to Dismiss (#113) at 18).  Second, the Cartons contend

that the Policies were void ab initio because they violated public policy.  (Opp'n to Mot. to Dismiss (#113) at 11-14).  As the Policies never really existed, the Insurers now hold $700,000 in premium payments from the Cartons without providing coverage in return.  The Cartons thus assert they have suffered an injury in fact because they paid the premiums on nonexistent policies.

Both of these arguments require the Court to first determine the validity of the Policies and whether they were void as against public policy.  The Policies were issued in Nevada, California, Iowa, and South Carolina.  (FAC (#43) at 7-8).  Under the laws of these states—as is the case in most states—STOLI arrangements are against public policy.  *See* J. Allan Jensen et al., STRANGER-OWNED LIFE INSURANCE: A POINT/COUNTERPOINT DISCUSSION, 33 ACTEC J. 110, 115 (2007) (premium financing schemes are a "violation of the spirit if not the letter of the insurable interest law in every state in this country").

## I.    The STOLI Arrangement Violated Public Policy

Under Nevada law, a person may not "procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under the contract are payable to the person insured or the personal representatives of the person insured, or to a person having, at the time when the contract was made, an insurable interest in the person insured."  NEV. REV. STAT. § 687B.040(1).  A trust may also not obtain life insurance upon the life of a person unless each beneficiary of the trust has an insurable interest in the person insured.  NEV. REV. STAT. § 687B.040(2)(a).  A party has an insurable interest if they are related closely by blood or law and have a substantial interest engendered by love and affection, or have a lawful and substantial economic interest in having the life, heath or bodily safety of the insured continue.  NEV. REV. STAT. § 687B.040(4).  The Supreme Court of Nevada has held that a party who pays the insurance premiums on the life of another has no insurable interest in the life of the insured.  *Waldman v. Maini*, 195 P.3d 850, 859-60 (Nev. 2008).  The STOLI agreement thus violates the law of Nevada.

Under Iowa law, it is forbidden to commit a fraudulent viatical settlement act.  IOWA CODE § 508E.15(1)(a).  A fraudulent viatical settlement act is defined as "[a]n act or omission

8

committed by any person, who knowingly or with intent to defraud, for the purpose of depriving another of property or for pecuniary gain, commits or permits its employees or its agents to . . . enter[ ] into any practice or plan which involves stranger-originated life insurance."   IOWA CODE § 508E.2(6)(a)(3).   Stranger-originated life insurance practices include cases in which a life insurance policy is "purchased with resources or guarantees from or through a person or entity who, at the time of the policy inception, could not lawfully initiate the policy . . . and where, at the time of the policy's inception, there is an arrangement or agreement . . . to directly or indirectly transfer the ownership of the policy or the policy benefits to a third party."   IOWA CODE § 508E.2(12)(a).   "Trusts that are created to give the appearance of an insurable interest, and are used to initiate policies for investors, violate insurable interest laws and the prohibition against wagering on life."   *Id.*   This describes the exact scenario here, and therefore the Policies were in violation of Iowa law.

In South Carolina, "[o]ne cannot obtain valid insurance upon the life of another in whom he has no insurable interest."   *Warren v. Pilgrim Health & Life Ins. Co.*, 60 S.E.2d 891, 893 (S.C. 1950); *see also Powell v. Ins. Co. of N. America*, 330 S.E.2d 550, 551-52 (S.C. Ct. App. 1985).   Such contracts are "void in its inception and unenforceable on grounds of public policy, being a mere wagering contract."   *Elmore v. Life Ins. Co. of Virginia*, 198 S.E. 5, 7 (S.C. 1938). An insurable interest exists when the party derives a benefit from the existence of the insured or would suffer loss from their death.   *See Benton & Rhodes, Inc. v. Boden*, 426 S.E.2d 823, 826 (S.C. Ct. App. 1993).   A party that has no insurable interest may be made the beneficiary of a policy, but only if done in good faith an not to cover a wagering policy.   *Warren*, 60 S.E.2d at 893.   Policies created as part of a STOLI scheme are not created in good faith, and thus they are against South Carolina public policy.

STOLI arrangements are also against public policy under California law.   In California, life insurance contracts are void if the insured has no insurable interest.   CAL. INS. CODE § 280. An insurable interest exists where the party has an interest based upon a reasonable expectation of pecuniary advantage through the continued life of another person, or where the party is related by blood or law and has a substantial interest engendered by love and

9

affection.  CAL. INS. CODE § 10110.1(a).  It is a violation of California law to create "[a]ny device, scheme, or artifice designed to give the appearance of an insurable interest where there is no legitimate insurable interest." CAL. INS. CODE § 10110.1(e).  "[A]ny arrangement by which a life insurance policy is initiated for the benefit of a 'third party investor' who has no insurable interest in the insured's life at the time the policy is issued is deemed a STOLI, which is a prohibited 'fraudulent life settlement act.' "  *Ohio Nat'l Life Assurance Corp. v. Davis*, No. CV 10-4241 ODW (MANx), 2010 WL 4916643, at *3 (C.D. Cal. Dec. 1, 2010).  Consequently, the STOLI arrangement in the present case violates California public policy.

Although an insured may generally purchase life insurance in good faith intending to keep it for himself and later assign it to a third party, regardless of whether the third party has an insurable interest, where a person who has an interest "lends himself to one without any, as a cloak to what is, in its inception, a wager" then the contract is void as against public policy. *Grigsby v. Russell*, 222 U.S. 149, 156 (1911); *see also Hartford Life & Annuity Ins. Co. v. Doris Barnes Family 2008 Irrevocable Trust*, No. CV 10-7560 PSG (DTBx), 2011 WL 759554, at *4 (C.D. Cal. Feb. 22, 2011) (finding a policy which was intended from its inception to be sold to third-party investors to be against public policy);  NEV. REV. STAT. § 687B.040(1) (an insurable interest must exist when the contract is made);  IOWA CODE § 508E.2(12)(a) (same); *Warren*, 60 S.E.2d at 893 (policy must be created in good faith by one with an insurable interest).  When a contract violates public policy, it is void ab initio and will be treated as though no contract ever existed. *Paul Revere Life Ins. Co. v. Fima*, 105 F.3d 490, 492 (9th Cir. 1997); *Elmore*, 198 S.E. at 7; *see also* BLACK'S LAW DICTIONARY 1574 (8th ed. 2004) (entry under "void ab initio") ("A contract is void ab initio if it seriously offends law or public policy, in contrast to a contract that is merely voidable at the election of one party to the contract.").

The arrangement here is a typical STOLI scheme.  The scheme was carefully structured so that although the Insured were technically the owners of the Policies, the true owners were the LLCs and investors.  Even though the premiums were paid in the form of a "loan", the Insured never intended to repay the premium payments.  (Opp'n to Mot. to Dismiss (#113) at 11).  This is evidenced by the fact that none of them repaid the loan and allowed the

Policies to default.  (Mot. to Dismiss (#90) at 5; FAC (#43) at 26-30).  The scheme was structured so that the Insured would get free life insurance for two years, and then after that time the Insured would allow the Policies to be sold on the secondary market to repay the Cartons and other investors.  Indeed, the arrangement was specifically structured so that the Insured would not retain the Policies.  At 20%, the interest rate was excessively high and discouraged the Insured from repaying the loan.  (*See* FAC (#43) at 16).  The loan period was also to last for two years, which happens to coincide with the period of time insurance companies have to contest information on the Insureds' applications and is typical of STOLI schemes.   The ILITs and the LLCs were created to hide from the Insurers the interest investors had in the Policies, which would have been unnecessary if the financing was intended merely as a loan. As this was a standard STOLI arrangement under which investors were in substance the true owners of the Policies, the arrangement violated public policy and the Policies were void ab initio.

### ii.      Plaintiffs Have Standing to Bring Their Claims

Because the Policies were void ab initio, the Policies were never truly in existence.  The Cartons' first argument that they have standing because they were the collateral assignees of the Policies therefore fails because the Policies were a nullity from inception.  Although the Insured may have signed collateral agreements with the Cartons assigning them an interest in the Policies, because the Policies were void ab initio, there are no policies in which the Cartons could have a valid interest.   The Cartons cannot claim standing as collateral assignees of nonexistent policies.

The Cartons' second argument that they have standing because the Insurers are holding funds that rightfully belong to the Cartons however has more merit.  The Cartons argues that they paid $700,000 in premiums on the Policies, which were void ab initio.  (FAC (#43) at 14; Opp'n to Mot. to Dismiss (#113) at 11).  Because the Policies never existed, the Cartons argue the Insurers were unjustly enriched because they are retaining the premium payments and never actually provided any coverage on the Policies because they were void. (Opp'n to Mot. to Dismiss (#113) at 14-18).  The Cartons contend that when a contract is void

1   ab initio, the general rule is that the court is to restore the parties to their status quo.  (Opp'n

2   to Mot. to Dismiss (#113) at 14 (citing *In re Cross*, 290 B.R. 157, 160 (Bankr. D. Nev. 2001)).

3   Because the Insurers continue to hold premium payments provided by the Cartons for policies

4   which were never valid, the Cartons have suffered an injury in fact and have standing to bring

5   this suit.

6        **B.      Failure to State a Claim**

7            **1.      Legal Standard**

8            The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test

9   the legal sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

10  "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled

11  to offer evidence to support the claims."  *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th

12  Cir. 1997) (citations omitted).

13          To avoid a Rule 12(b)(6) dismissal, a complaint must plead "enough facts to state a

14  claim to relief that is plausible on its face."  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017,

15  1022 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim

16  is plausible on its face "when the plaintiff pleads factual content that allows the court to draw

17  the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.

18  Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009).  Although detailed factual allegations are

19  not required, the factual allegations "must be enough to raise a right to relief above the

20  speculative level."  *Twombly*, 550 U.S. at 555.  All well-pleaded factual allegations will be

21  accepted as true and all reasonable inferences that may be drawn from the allegations must

22  be construed in the light most favorable to the nonmoving party.  *Broam v. Bogan*, 320 F.3d

23  1023, 1028 (9th Cir. 2003).

24          If the court grants a motion to dismiss a complaint, it must then decide whether to grant

25  leave to amend.  The court should freely give leave to amend when there is no "undue delay,

26  bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing

27  party by virtue of allowance of the amendment, [or] futility of amendment."  *Foman v. Davis*,

28  371 U.S. 178, 182 (1962); *see also* FED. R. CIV. P. 15(a).  Generally, leave to amend is only

1   denied when it is clear that the deficiencies of the complaint cannot be cured by amendment.

2   *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

3               **2.     Analysis**

4         The only claims against the Insurers in the FAC are those for: (a) declaratory relief and

5   rescission of the Policies (claim two); (b) declaratory relief and refund of premiums (claim

6   three); (c) unjust enrichment (claim ten); and (d) injunctive relief (claim eleven).

7         Under the two declaratory relief claims, the Cartons seek to have the Policies declared

8   null and void ab initio and to have the premiums be disgorged.  (FAC (#43) at 35).  The

9   Cartons also seek to have the Court declare the rights and obligations of each of the parties

10  with respect to the premiums.  (*Id.* at 36).  Under the Cartons' claim for injunctive relief they

11  seek to have the Insurers acknowledge the Policies were void ab initio, have the Policies

12  rescinded, and disgorge the premium payments.  (*Id.* at 42-43).  Ultimately, these claims are

13  dependent upon the Cartons' claim for unjust enrichment because the Cartons are not entitled

14  to be declared the rightful owner of the premiums and to have them disgorged unless they first

15  prevail on this claim.

16        In the claim for unjust enrichment, the Cartons note that the premiums were paid on the

17  Policies for the purpose of providing insurance coverage to the Insured.  (*Id.* at 42).  Yet

18  because the Policies were void ab initio, the Policies never existed and the Insurers accepted

19  the premiums without actually providing any coverage.  (*Id.* at 35).  Consequently, the Cartons

20  argue, the Insurers have been unjustly enriched.  (*Id.* at 41-42).

21        Unjust enrichment is alleged where there is the retention of a benefit which in equity

22  and good conscience belongs to another.  *In re Amerco Derivative Litigation*, 252 P.3d 681,

23  703 (Nev. 2011) (citations omitted); *see also Lectrodryer v. SeoulBank*, 91 Cal.Rptr.2d 881,

24  883 (2000) (unjust enrichment is the "receipt of a benefit and the unjust retention of the benefit

25  at the expense of another"); *Union Pac. R.R. Co. v. Cedar Rapids & Iowa City R.R. Co.*, 477

26  F.Supp.2d 980, 1000 (N.D. Iowa 2007) (stating the elements for an unjust enrichment claim

27  are: (1) the plaintiff confers a benefit on the defendant to his own detriment; (2) the defendant

28  appreciates the benefit; (3) the defendant retains the benefit under circumstances making it

inequitable for there to be no return payment for its value; and (4) there is no remedy at law).

The Cartons allege they were defrauded into financing the Policies, not knowing the STOLI arrangement was against public policy.  (FAC (#43) at 31-32; Opp'n to Mot. to Dismiss (#113) at 11).  By paying the premiums, they certainly conferred a benefit on the Insurers.  The Policies were also void ab initio, and as a result the Insured never really had the life insurance coverage the Cartons paid for.

Yet the Cartons have ultimately failed to state a claim against the Insurers because it is not inequitable to allow the Insurers to retain the premium payments.  The Insurers were the clear victims of the STOLI scheme.  Although the Policies were void as against public policy, the Insurers are not alleged to have had any knowledge of the scheme or that the Policies were void ab initio.[1]  Consequently, the Insurers bore the risk that the scheme would not be uncovered and that they would unknowingly pay the death benefits to the Insured even though the Policies never actually came into existence.  In contrast, the Cartons were at least on inquiry notice of the illicit scheme.  The Supreme Court of the United States noted as early as 1881 that an insurable interest is required to purchase a life insurance policy, *Warnock v. Davis*, 104 U.S. 775, 779 (1881), and STOLI arrangements violate "the spirit if not the letter of the insurable interest law in every state in this country."  J. Allan Jensen et al., STRANGER-OWNED LIFE INSURANCE: A POINT/COUNTERPOINT DISCUSSION, 33 ACTEC J. 110, 115 (2007).  The transaction described to the Cartons was a textbook STOLI arrangement,[2] which should have alerted the Cartons to the illicit nature of the "investment."  Several other red flags also

_____

[1] Although the Cartons asserted at oral argument that the Insurers had knowledge of the scheme because they accepted the premium payments from a party other than the insured, this is not enough to show the Insurers were aware of the arrangement, as it is not uncommon for trusts and other entities to pay the premiums on life insurance policies.

[2] Compare the striking similarities between the description given to the Cartons of the investment plan and the description of STOLI schemes in 3 LEO MARTINEZ ET AL., NEW APPLEMAN INSURANCE LAW PRACTICE GUIDE § 34.09[3] (2011).

14

1    should have placed the Cartons on inquiry notice, including the fact they were guaranteed a

2    20% return on their investment during a recession, the complicated manner in which the

3    arrangement was structured (which was unnecessary for a simple loan transaction), and the

4    fact they received the Policy applications which all implied that the Insured were paying the

5    premiums.   Although the Cartons may have ultimately been duped into entering the

6    arrangement, the facts clearly indicate they were at least put on notice that something in the

7    transaction was amiss.

8         Because it would be unjust to allow an innocent party who had inquiry notice of the illicit

9    scheme to obtain disgorgement from another innocent party without similar notice and who

10   bore the risk that the scheme would not be uncovered, the Court finds that the Cartons have

11   failed to state a claim for unjust enrichment against he Insurers.  As all of the Cartons' claims

12   against the Insurers relied on their claim for unjust enrichment, the Court grants the Insurers'

13   motions to dismiss (##55, 90).  The claims against he Insurers' are however dismissed without

14   prejudice.  If the Cartons are later able to state a cause of action under Rule 11 that the

15   Insurers had knowledge of facts that would put them on notice that they were issuing the

16   Policies to parties who did not have an insurable interest, the Court will allow the Cartons to

17   again add the Insurers as defendants in this action.

18   **II.    The Cartons' Motion to Dismiss, Strike, and for Entry of Default**

19        The Cartons have also filed a motion to dismiss certain Defendants' counterclaims,

20   strike unsigned pleadings, and for entry of default against Defendants who are entities who

21   have not yet obtained legal counsel. (Mot. to Dismiss, Strike, and Entry of Default (#62)).  This

22   motion is granted in part and denied in part for the following reasons.

23        **A.    Failure to State a Claim**

24        The Cartons contend that Defendants Eberle, R. Koppel, S. Koppel, B&B, Global

25   Resources, Pro Financial, and Pro Fi all submitted an "Answer and Counterclaim" but no

26   counterclaims were set forth in the pleadings.  (*Id.* at 4).  Plaintiffs argue that these

27   counterclaims should be dismissed for failure to state a claim.  (*Id.*).

28        Federal Rule of Civil Procedure 8(a)(2) requires a counterclaim to state "a short and

15

1   plain statement of the claim showing that the pleader is entitled to relief."  To avoid a Rule

2   12(b)(6) dismissal for failure to state a claim, the counterclaims must plead "enough facts to

3   state a claim to relief that is plausible on its face." *Clemens v. DaimlerChrysler Corp.*, 534

4   F.3d 1017, 1022 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

5   (2007)).  Leave to amend a claim should be freely given when there is no "undue delay, bad

6   faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party

7   by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*,  371

8   U.S. 178, 182 (1962); *see also* FED. R. CIV. P. 15(a).  Generally, leave to amend is only denied

9   when it is clear that the deficiencies of the complaint cannot be cured by amendment. *DeSoto

10  v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

11       Because no counterclaims have been stated in the pleadings, the counterclaims of the

12  above-named Defendants are dismissed with leave to amend.

13       **B.    Motion to Strike**

14       The Cartons have also moved to strike the pleadings of Defendants Eberle, R. Koppel,

15  S. Koppel, B&B, Global Resources, Pro Financial, and Pro Fi because the pleadings were

16  unsigned. (Mot. to Dismiss, Strike, and Entry of Default (#62) at 5).  Under Rule 11(a), every

17  pleading "must be signed by at least one attorney of record in the attorney's name—or by a

18  party personally if the party is unrepresented."  "The paper must state the signer's address,

19  e-mail address, and telephone number."  FED. R. CIV. P. 11(a).  The Court must strike an

20  unsigned paper unless the omission is promptly corrected after being called to the party's

21  attention. *Id*.

22       The parties here are all unrepresented and none of the above-mentioned pleadings

23  comply with Rule 11(a).  The only party who came close to compliance was Eberle, who

24  signed a cover letter that was filed concurrently with his answer but did not state his e-mail

25  address and telephone number as required. (Answer (#44)).  The Court therefore will allow

26  the named Defendants ten (10) days from the issuance of this order to correct the omission

27  and submit a pleading that is signed and includes the signer's address, e-mail address, and

28  telephone number.  If the named Defendants fail to comply, the Court will strike their pleadings

1    for noncompliance with Rule 11(a).

2              **C.    Motion for Entry of Default**

3         The Cartons have additionally moved for the entry of a default judgement against

4    Defendants EPSN, Pro Fi, Pro Financial, B&B, Global Resources and the Kenneth D. Huntley

5    ILIT because they are artificial entities that have appeared without council.  (Mot. to Dismiss,

6    Strike, and Entry of Default (#62) at 5-6).

7         An unnatural entity must be represented by licensed counsel.  *Rowland v. California*

8    *Men's Colony*, 506 U.S. 194, 201-02 (1993); *see also United States v. High Country Broad.*

9    *Co., Inc.*, 3 F.3d 1244, 1245 (9th Cir. 1993) (holding that default judgment may be entered

10   against an artificial entity for failing to retain counsel).  The named Defendants are all artificial

11   entities and each initially appeared without counsel.  However, after the Cartons filed their

12   motion, the Kenneth D. Huntley ILIT obtained legal representation, and therefore the Kenneth

13   D. Huntley ILIT is now in compliance with this rule.  (*See* Notice of Appearance (#94)).

14   Defendants EPSN, Pro Fi, Pro Financial, B&B, and Global Resources however have not yet

15   obtained licensed counsel to represent them.  These entities have ten (10) days from the entry

16   of this order to file notice that they have obtained licensed legal counsel or they risk the entry

17   of a default judgment against them.

18   **III.    Diggle's Motion to Dismiss**

19        Defendant Samuel Diggle has also filed a motion to dismiss pursuant to Rule 12(b)(1)

20   for lack of subject matter jurisdiction.  Diggle chiefly argues that none of the federal claims in

21   this action are directed against him, and the claims that are directed against him are unrelated

22   to the federal claims upon which federal jurisdiction is based.  For this reason, according to

23   Diggle, the Court lacks subject matter jurisdiction over the claims against him and the Samuel

24   L. Diggle ILIT.  (*Id.* at 4-7).

25        Federal courts are of limited jurisdiction, possessing only those powers granted by the

26   Constitution or statute. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994);

27   *United States v. Marks*, 530 F.3d 799, 810 (9th Cir. 2008).  The burden of establishing subject

28   matter jurisdiction fall upon the party asserting jurisdiction.  *Kokkonen*, 511 U.S. at 377.

1   Federal courts have original jurisdiction over "civil actions arising under the Constitution,

2   laws, or treaties of the United States." 28 U.S.C. § 1331.   Federal courts also have

3   supplemental jurisdiction "over all other claims that are so related to claims in the action within

4   such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. §

5   1367(a). "A state law claim is part of the same case or controversy when it shares a 'common

6   nucleus of operative fact' with the federal claims and the state and federal claims would

7   normally be tried together." *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004)

8   (quotation omitted).

9   The Cartons' basis for subject matter jurisdiction in this Court is that the arrangement

10   violated federal securities laws, and therefore this Court has jurisdiction over the matter as it

11   relates to the laws of the United States. *See* 28. U.S.C. § 1331. The remaining state causes

12   of actions are then brought in under the basis of supplemental jurisdiction.

13   Diggle however contends that the state law claims against him and the Samuel L.

14   Diggle ILIT do not arise out of the same case or controversy as the claims over which this

15   Court has original jurisdiction. (Mot. to Dismiss (#102) at 4-7). Specifically, Diggle argues that

16   the substance of the federal claims relates to bad investment decisions and the Cartons'

17   desire to have the insurance companies repay the premiums, and because Diggle and the

18   Samuel L. Diggle ILIT "have no dog in these . . . fights" they assert that the state law claims

19   against them are not derived from a common nucleus of operative fact. (*Id.* at 6). But the

20   relevant question for supplemental jurisdiction is not whether the defendant has an interest in

21   the federal cause of action, but whether the federal and state causes of action share a

22   common nucleus of operative fact. Here the federal and state causes of action clearly share

23   a common nucleus of operative fact as all of the Cartons' claims—both the federal and state

24   law claims—arise from the illicit STOLI scheme the parties engaged in, including Diggle and

25   the Samuel L. Diggle ILIT. Because the federal claims and the claims against Diggle all arise

26   from the defendants participation in the STOLI arrangement, the Court has supplemental

27   jurisdiction over the matter.

28   Diggle also argues the Cartons do not have standing to bring the claims against Diggle

18

because the security interest in the Diggle Policy was granted not to the Cartons, but to Plaintiff Samuel Diggle II, LLC.  (Mot. to Dismiss (#102) at 3-4).  Diggle further claims that Plaintiff Samuel Diggle II, LLC cannot sue Diggle because its charter has been revoked.  (*Id.*). The Cartons however have standing to sue Diggle because all the money they put into Samuel Diggle II, LLC went straight into the STOLI scheme.  Where an LLC is being used simply as a vehicle through which investments are made and the members of the LLC receive one unit in exchange for one dollar that is ultimately invested in the scheme, the investors have standing because there is a direct correlation between the investment and their membership interests.  *See Burnett v. Rowzee*, No. SA CV 07-641DOCANX, 2007 WL 2735682 (C.D. Cal. Aug. 28, 2007) (holding that plaintiffs could properly assert claims to recover money they lost in a Ponzi scheme despite the use of an LLC in the scheme).  This is especially true where the Plaintiff is the 100% owner of the LLC, as the Cartons are here.  (FAC (#43) at 24).  The fact Samuel Diggle II, LLC's charter was revoked also does not affect its ability to sue or be sued.  *AA Primo Builders, LLC v. Washington*, 245 P.3d 1190, 1195 (Nev. 2010) ("[T]he right to 'transact business' that is forfeited on charter revocation does not normally include an LLC's capacity to sue and be sued.").  These claims accordingly also lack merit.

## CONCLUSION

For the above reasons, IT IS ORDERED American General's Motion to Dismiss (#55) and Aviva's Motion to Dismiss (#90) are granted without prejudice.  The Cartons' are permitted to later add American General and Aviva as defendants so long as they can show that American General and Aviva had knowledge of sufficient facts that would have put them on at least inquiry notice that they were issuing policies to parties with uninsurable interests.

IT IS FURTHER ORDERED that the Cartons' motion to dismiss, strike and for entry of default judgment (#62) is granted as to the Cartons' motion to dismiss the counterclaims, but denied as to the Cartons' motions to strike and for entry of default judgment.

IT IS FURTHER ORDERED that Defendants R. Koppel, S. Koppel, B&B, Global Resources, Pro Financial, and Pro Fi are to file with the Court an amended answer that is signed by the party or his or her licensed counsel no later than ten (10) days from the issuance

1    of this order.

2            IT IS FURTHER ORDERED that Defendants EPSN, Pro Fi, Pro Financial, B&B, Global

3    Resources are to file with the Court a notice that they have obtained licensed legal counsel

4    no later than ten (10) days from the issuance of this order.

5            IT IS FURTHER ORDERED that Diggle's motion to dismiss for lack of subject matter

6    jurisdiction (#102) is denied.

7

8            DATED: This 7th day of December, 2011.

9

10

11    _____

12    United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28