# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| EDWIN CARTON et al., ) | |
| Plaintiffs, ) | |
| ) | 2:11-cv-00746-RCJ-PAL |
| vs. ) | |
| B&B EQUITIES GROUP, LLC et al., ) | **ORDER** |
| Defendants. ) | |

This case arises out of a set of complex life insurance investments. Pending before the Court is Leon and Wanda Dean's (collectively, "the Deans") Motion for Determination of Good Faith Settlement (ECF No. 192). For the reasons given herein, the Court grants the motion.

## I.    FACTS AND PROCEDURAL HISTORY

Stranger-originated life insurance ("STOLI") arrangements have become increasingly common over the past decade. *See Sun Life Assurance Co. of Canada v. Berck*, 770 F. Supp. 2d 728, 729–30 (D. Del. 2011). In a typical STOLI scheme, a speculator collaborates with an elderly individual who has a high net worth in obtaining a life insurance policy against the life of the wealthy individual. *See generally* 3 Leo Martinez et al., *New Appleman Insurance Law Practice Guide* § 34.09[3] (2011). The wealthy individual is often promised cash upon the future sale of the policy or enticed to enter the arrangement through the promise of two years of free life insurance. The speculator provides non-recourse financing to purchase the policy—secured by the policy—which comes due after the two-year contestability period during which the insurer has to challenge the policy. If the insured dies within the two-year contestability period, the

speculator is repaid, with interest, out of the proceeds of the policy.  If the insured survives the two-year contestability period, there are two ways he or she may repay the speculator.  First, the insured may pay the outstanding debt and accrued interest and retain the policy.  This option is generally less attractive because the interest rates are often high or because the insured was promised a portion of the proceeds upon the sale of the policy.  Second, the insured may transfer the policy to the speculator to satisfy the debt, and the speculator may then sell the policy on the secondary market.  These arrangements ultimately amount to unlawful wagering and have generally been disfavored by courts. *See Berck*, 770 F. Supp. 2d at 730.

      Plaintiffs Edwin and Lonnie Carton were first introduced to STOLI transactions by Defendant Bruce Plotnick, whom they met at a financial planning seminar in the early to mid 2000's.  (First Am. Compl. 12, July 12, 2011, ECF No. 43).  Plotnick was the featured lecturer at the seminar and is the principal employee and owner of Defendant Estate Planning Solution Network ("EPSN"). (*Id.* 7).  Plotnick suggested the Cartons invest their retirement funds in a concept called "premium financing" through Defendant Robert Koppel ("R. Koppel"). (*Id.*). Plotnick and R. Koppel told the Cartons that B&B Equities Group, LLC ("B&B"), a Nevada limited liability company whose managing members are Defendants R. Koppel and Robert Eberle, would organize limited liability companies which would be assigned the rights to the life insurance policies of the insured third-parties and would assume the liabilities in funding the policies. (*Id.* 13).  The Cartons were then informed they would receive an ownership interest in these limited liability companies and were guaranteed a return of 20% on their investment. (*Id.*). The Cartons were also told that the insurance premiums would be paid by the limited liability companies for a two year period, after which they would be repaid in one of two ways: (1) the insured would keep the policy and pay off the loan with interest, or (2) the insured would sell the policy on the secondary market. (*Id.* 10).  The Cartons claim they were under the impression that this type of transaction was legal and that the insurance company would have full knowledge of

the arrangement. (*See* Opp'n to Mot. to Dismiss 9, ECF No. 113).

On July 16, 2008, the Cartons invested $700,000 with B&B through Plotnick and R. Koppel. (First Am. Compl. 14).  The investment was spread over seven insurance policies (collectively, "the Policies"), which insured six individuals (collectively "the Insureds"). (*Id.* 17). Three of the Policies were through Defendant American General Life Insurance Co. ("American General") and insured Defendants–Insureds Thomas E. Colbert, Wanda D. Dean, and Kenneth D. Huntley. (*Id.*).  Thomas Colbert is a resident of Nevada, Wanda Dean is a resident of California, and Kenneth Huntley is a resident of Iowa. (*Id.* 7–8).  Three of the Policies were through Defendant Aviva Life and Annuity Co. ("Aviva") and insured Defendants–Insureds Kenneth D. Huntley, Leon E. Dean, and Samuel L. Diggle. (*Id.* 17).  Leon Dean is a resident of California and Samuel Diggle is a resident South Carolina. (*Id.* 7–8).  The final policy was through Americo Financial Life & Annuity Insurance Co. ("Americo") and insured Defendant–Insured Gloria Diaz Rivera, a resident of Puerto Rico. (*Id.* 8, 17).  The face amounts of these policies ranged from $600,000 to $3,000,000. (*Id.* 17).  The beneficiaries of the Policies were irrevocable life insurance trusts that bore the names of the respective Insureds, e.g., "the Kenneth D. Huntley Irrevocable Life Insurance Trust" (collectively, the "ILITs"). (*Id.* 8, 18).  The Insureds served as trustees for their respective ILITs. (*Id.* 19).

On the American General applications for life insurance, the Insureds failed to answer the question that asked for information about the "Premium Payor" if it were different from the policy owner, even though third parties, viz., Plaintiffs, were in fact providing financing to pay the policy premiums. (*Id.* 26–28).  On the Aviva applications for life insurance, the Insureds failed to inform Aviva of the premium financing arrangement. (*Id.*).

The Insured signed promissory notes in their capacities as trustees of their respective ILITs, promising to repay the loans obtained from the Cartons and agreeing to an interest rate of 20% per annum on those loans. (*Id.*).  This amount became payable either: (a) the day following

the two year anniversary of the note; (b) the date of the death of the insured; (c) the date of any breach; or (d) the date of any default. (*Id.* 20).  Limited liability companies were created bearing the names of the Insureds (Plaintiffs Kenneth Huntley II, LLC; Kenneth Huntley IV, LLC; Leon Dean II, LLC; Gloria Diaz II, LLC; Thomas Colbert V, LLC; Wanda Dean II, LLC; and Samuel Diggle II, LLC) (collectively, the "LLCs"), and the Insureds executed collateral assignments assigning and pledging the insurance policies to the LLCs as collateral to secure the loans financing the first two years of premium payments. (*Id.* 21).  The Cartons obtained an interest in the LLCs reflecting the percentage of the funding they provided for the respective life insurance policy premiums, and in August 2008 they received a package of documents that included the insurance application for each policy, the secured promissory note, the collateral assignment, and other relevant documents. (*Id.* 16, 25).

The loans were all set to expire between June and September of 2009. (*Id.* at 27–29). However, in July of 2009, the Cartons received letters informing them that additional investors had been brought in to pay a third year of premiums on four of the Policies, thus decreasing the Cartons' percentage interest in the Policies. (*Id.* 25–26).  None of the Policies were sold, and apparently all of the policies have since lapsed for non-payment. (*See* Mot. to Dismiss 5, ECF No. 90).  The Cartons never received their principal or the guaranteed interest on their investment. (First Am. Compl. 26–30).

The Cartons sued the following Defendants in this Court: B&B, Global Equity Preservation, Inc. ("Global Preservation"); Global Equity Resources, LLC ("Global Resources"); Eagle Investment Corporation of America; Pro Financial Group, Inc. (also registered under the name "Pro Fi Group"); R. Koppel; Robert Eberle; Steve Koppel (a shareholder and officer of B&B) ("S. Koppel"); EPSN; Plotnick; the Insureds; the ILITs who were named as beneficiaries of the Policies; Aviva; American General, Americo, and others. (*See* Compl., ECF No. 1). Plaintiffs brought fourteen nominal causes of action. (*See id.*).  Americo included third-party

claims, crossclaims, and counterclaims in its Answer to the Complaint.  The Hon. Judge Kent J. Dawson recused himself, and the Clerk reassigned the case to this Court.

Plaintiffs filed the First Amended Complaint ("FAC"), which joins the LLCs as Plaintiffs and lists the same fourteen nominal causes of action: (1) Securities Fraud under § 10(b) of the Securities Exchange Act and SEC Rule 10b-5; (2) Declaratory Judgment (rescission); (3) Declaratory Judgment (refund of premiums); (4) Securities Fraud under Nevada Revised Statutes ("NRS") section 90.660; (5) Fraud; (6) Constructive Fraud; (7) Breach of Contract (B&B Investment Agreements); (8) Breach of Contract (Loan Documents); (9) Foreclosure; (10) Unjust Enrichment; (11) Injunctive Relief; (12) Breach of Fiduciary Duty; (13) Deceptive Trade Practices under NRS Chapter 598; and (14) Professional Negligence. (*See* Am. Compl., July 12, 2011, ECF No. 43).  Defendant Pro Fi Group, Inc. included counterclaims with its Answer to the FAC.  Americo included third-party claims, crossclaims, and counterclaims in its Answer to the FAC.

The Court granted American General's and Aviva's separate motions to dismiss and denied Defendants' Samuel Diggle's and the Samuel L. Diggle Irrevocable Life Insurance Trust's motion to dismiss.  In substance, the Court ruled that the Insureds never intended to repay the premium payments, but that the transactions were structured to ensure free life insurance to the Insureds for two years, after which the Policies would be sold on the secondary market to repay the investors.  The Court also found that the ILITs and LLCs were created to hide the investors' interests in the Policies form the insurers.  The STOLIs were therefore invalid and void ab initio under the respective laws or public policies of Nevada, California, Iowa, and South Carolina, in which states the STOLIs were issued.  The Court ruled that the Cartons had standing not because of their interests in the Policies, which were void, but rather because the insurers held funds that rightfully belonged to the Cartons, i.e., under an unjust enrichment theory.  The Court ruled that the Cartons' claims for declaratory and injunctive relief against the insurers therefore depended

upon their unjust enrichment claim, which the Court dismissed for failure to state a claim because it was not inequitable for the insurers to retain the premiums under the present circumstances, but that, on the contrary, it would be inequitable to order disgorgement of funds from an innocent party to a party that had notice of facts clearly making the agreement void.  The insurers were themselves victims of the STOLI scheme with no knowledge thereof or complicity therein, and who bore the risk of having to pay under the Policies, whereas the Cartons and other investors were clearly on notice of the scheme even if they had no illicit intent.  The Court therefore dismissed the claims against the insurers, without prejudice, permitting Plaintiffs to amend to plead facts indicating that the insurers had notice of the illicit scheme such that equity might permit an unjust enrichment claim.

The Court denied Defendants' Samuel Diggle's and the Samuel L. Diggle Irrevocable Life Insurance Trust's motion to dismiss for lack of subject matter jurisdiction.  The Court ruled that the state law claims against those Defendants were sufficiently related to the securities fraud issues to support supplemental jurisdiction.  All the claims arose out of the same "nucleus of operative fact": the STOLI schemes.  The Court also ruled that the LLCs could still sue and be sued under Nevada law despite having had their charters revoked, and that the Cartons had standing to sue those Defendants because Plaintiffs' use of an LLC as a vehicle for their investments did not obviate their injury in fact.

The Court granted Plaintiff's motion to dismiss the counterclaims of certain Defendants because the "counterclaim" in fact set forth no counterclaims in the pleading so titled.  The Court also struck certain Defendants' pleadings for failure to comply with the Rule 11 signature requirement.

Finally, the Court noted that if Defendants ESPN, Pro FI, Pro Financial, B&B, and Global Resources did not obtain legal representation by December 17, 2011, they would risk entry of default judgment, because corporate entities could only appear in court through admitted counsel.

The parties later stipulated to dismiss all claims against Americo and the Diaz entities pursuant to a settlement agreement.  Plaintiffs voluntarily dismissed as against Defendants Crump Insurance Services, Inc., f.k.a. Bisys Insurance Services, Inc., and Kyle Bloss.

Torkelson filed a Motion for Judgment on the Pleadings, which the Court denied as moot. The Court granted Plaintiffs' Motion for Leave to File a Second Amended Complaint and two motions for determination of good faith settlement filed by Burns, Huntley, and Torkelson.  The Court adopted the magistrate judge's Report and Recommendation ("R&R") recommending that the Answers of Defendants Robert L. Eberle, B&B Equities Group, LLC ("B&B"), Global Equity Resources, LLC, Pro Financial Group, Inc., Pro Fi Group, Inc., and Estate Planning Solutions Network, LLC be stricken and that default judgment be entered against those Defendants.

The Deans, individually and as trustees for the Leon E. Dean Irrevocable Life Insurance Trust, now ask the Court to determine that their settlement was made in good faith.

## II.   LEGAL STANDARDS

Under Nevada law, a court's declaration that a settlement is entered into in good faith has specific legal effects:

> 1. When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
>
>     (a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and
>
>     (b) It discharges the tortfeasor to whom it is given from all liability for contribution and for equitable indemnity to any other tortfeasor.
>
> 2. As used in this section, "equitable indemnity" means a right of indemnity that is created by the court rather than expressly provided for in a written agreement.

Nev. Rev. Stat. § 17.245.  In 1983, a court of this District had anticipated that the Nevada Supreme Court would adopt the rationale of the California courts in interpreting "good faith"

under the statute. *See Velsicol Chem. Corp. v. Davidson*, 811 P.2d 561, 563 (Nev. 1991) (quoting *In re MGM Grand Hotel Fire Litig.*, 570 F. Supp. 913, 927 (D. Nev. 1983) (Bechtle, J.) ("Factors to be considered by the Court in assessing whether a settlement is in good faith is [sic] the amount paid in settlement, the allocation of the settlement proceeds among plaintiffs, the insurance policy limits of settling defendants, the financial condition of settling defendants, and the existence of collusion, fraud or tortious conduct aimed to injure the interests of non-settling defendants.") (alteration in original)). The Nevada Supreme Court, however, rejected the limitations of California's five-factor test, ruling instead that "determination of good faith [is] left to the discretion of the trial court based upon all relevant facts available, and . . . in the absence of an abuse of that discretion, the trial court's findings [will] not be disturbed." *Id.*

### III.   ANALYSIS

No party has objected to the Motion for Determination of Good Faith Settlement, and Plaintiffs have responded only to join the motion. Plaintiffs and the Deans represent that the Deans deny any liability and have good faith defenses but wish to avoid litigation expenses, that there is no collusion, and that there are no insurance policies that might potentially indemnify the Deans against Plaintiffs' claims. According to the settlement agreement submitted *in camera*, the Deans deny liability but will pay the Cartons $7500 to buy their peace, with the parties to bear their own fees and costs. The Court finds the agreement to be in good faith.

///
///
///
///
///
///
///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Determination of Good Faith Settlement (ECF No. 192) is GRANTED.

IT IS SO ORDERED.

Dated this 11th day of March, 2013.

_____
ROBERT C. JONES
United States District Judge