# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| EDWIN B. CARTON, an individual; LONNIE C. CARTON, an individual; KENNETH HUNTLEY II, LLC, a Nevada limited liability company; KENNETH HUNTLEY IV, LLC, a Nevada limited liability company; LEAON DEAN II, LLC, a Nevada limited liability company; GLORIA DIAZ II, LLC, a Nevada limited liability company; THOMAS COLBERT V, LLC, a Nevada limited liability company; WANDA DEAN II, LLC, a Nevada limited liability company; SAMUAL DIGGLE II, LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>B&B EQUITIES GROUP, LLC,; et al,<br><br>Defendants. | 2:11-cv-00746-RCJ-WGC<br><br>**ORDER** |

Before the Court are motions by Defendants American General Life Insurance Company ("AG") and Aviva Life and Annuity Company ("Aviva") to dismiss Plaintiffs' Second Amended Complaint and Cross-Defendants' Cross-Claims. For the reasons stated herein, the Court denies the motions to dismiss Plaintiff's Second Amended Complaint, but dismisses the Cross-Defendants' Cross-Claims as moot.

I.      Background

This Action is brought by Plaintiffs Edwin B. Carton and Lonnie C. Carton (the "Cartons" or "Plaintiffs") against several Defendants (identified below) to recover $700,000, plus interest and damages.  The Cartons invested $700,000 with Defendant B&B Equities Group ("B&B") through Defendants Robert L. Kopel ("Kopel") and Bruce S. Plotnick ("Plotnick"). The Cartons assert that Defendants Kopal and Plotnick assured them that their investment in life insurance premiums was legal and secure.  Specifically, the Cartons allege that they were assured that (a) the Policies were legal and valid; (b) the Insureds needed a loan to pay premiums on the Policies; (c) the Insureds were willing to pay 20% interest on a loan to pay the premiums; (d) the Insureds would repay the loan after 12 months; and (e) the Policies were pledged as security for the loan, meaning that in the event an Insured died prior to repayment, the loan would be repaid from the death benefits, or in the event the Insureds could not make the required payments, the Cartons could foreclose upon the policy and sell it. (SAC, ECF No. 188 at 11-12).  Yet, in fact, the Cartons naively invested nearly three-quarters of a million dollars in the unscrupulous and largely statutorily prohibited, quasi-investment scheme of financing the premiums of third-party life insurance policies–namely, stranger-originated life insurance ("STOLI") schemes.  Though premium financing of life insurance policies by third parties is a common practice utilized in estate planning, STOLIs are generally not acceptable in the industry and disfavored by the courts. *See Sun Life Assurance Co. of Canada v. Berck*, 770 F.Supp.2d 728, 729-30 (D. Del. 2011).

The major difference between the two is explained as follows.  With a legitimate Irrevocable Life Insurance Trust ("ILIT") executed for estate planning, the trust is typically initiated and funded by a third party, usually the benefactor, to cover future estimated estate taxes with the proceeds of the death benefit payable to the trust. In any event, the payer of the policy is not a stranger to the insured or the beneficiary, which is typically a designated ILIT.  With a STOLI scheme, the investors use a legitimate estate planning vehicle for illegitimate investment

purposes–gambling on the life or death of a stranger. In a typical STOLI scheme, a speculator collaborates with an elderly individual who has a high net worth for the purpose of obtaining a life insurance policy on the life of the wealthy individual. *See generally* 3 Leo Martinez et al., New Appleman Insurance Law Practice Guide § 34.09[3] (2011). The wealthy individual is often promised cash upon the future sale of the policy or enticed to enter the arrangement through the promise of two years of free life insurance. The speculator provides non-recourse financing to purchase the policy—secured by the policy—which comes due after the two-year contestability period, during which the insurer has to challenge the policy, has run. If the insured dies within the two-year contestability period, the speculator is repaid, with interest, from the proceeds of the policy. If the insured survives the two-year contestability period, then there are two ways he or she may repay the speculator. First, the insured may pay the outstanding debt and accrued interest and retain the policy. This option is generally less attractive because the interest rates are often high or because the insured was promised a portion of the proceeds upon the sale of the policy. As a second option, the insured may transfer the policy to the speculator to satisfy the debt, and the speculator may then sell the policy on the secondary market. These policies may or may not be financed with a one-pay premium. This means that keeping a policy active may require the payment of additional, future premiums. Where future premiums are required, there is a lower return on a STOLI investment the longer the insured lives. Thus, in these cases, investors are not simply gambling on the life or death of the insured, they realize a greater return the sooner the insured dies. These arrangements ultimately amount to unlawful wagering and have generally been disfavored by courts. *See Berck*, 770 F.Supp.2d at 730.

The Cartons were first introduced to STOLI transactions by Defendant Bruce Plotnick, whom they met at a financial planning seminar in the early to mid 2000's. (FAC, ECF No. 43 at 12). Plotnick was the featured lecturer at the seminar and is the principal employee and owner of Defendant Estate Planning Solution Network ("EPSN"). (*Id.* at 7). Plotnick suggested the

1  Cartons invest their retirement funds in "premium financing" through Defendant Robert Koppel
2  ("R. Koppel"). (*Id.*).  Plotnick and R. Koppel allegedly told the Cartons that B&B Equities
3  ("B&B"), a Nevada limited liability company, whose managing members are Defendants R.
4  Koppel and Robert Eberle, would organize limited liability companies that would be assigned the
5  rights to the life insurance policies of the insured third-parties and assume the liabilities in
6  funding the policies. (*Id.* at 13).  The Cartons assert that they were then informed that they would
7  receive an ownership interest in these limited liability companies and were guaranteed a return of
8  20% on their investment. (*Id.*).  The Cartons were also allegedly told that the insurance premiums
9  would be paid by the limited liability companies for a two year period, after which they would be
10 repaid in one of two ways: (1) with the insured keeping the policy and paying off the loan with
11 interest, or (2) by the insured selling the policy on the secondary market. (*Id.* at 10).
12        The Cartons claim they were under the impression that this type of transaction was legal
13 and that the insurance company would have full knowledge of the arrangement. (Opp'n to Mot.
14 to Dismiss, ECF No. 113 at 9).  On July 16, 2008, the Cartons invested $700,000 with B&B
15 through Plotnick and R. Koppel by wiring the funds to an account set up in the name of Global
16 Equity Preservation. (FAC, ECF No. 43 at 14). In August of 2008, the Cartons received a
17 package of documents containing information regarding seven (7) insurance policies,
18 representing a total face value of $11,750,000, for which B&B had financed premiums using the
19 money invested by the Cartons. These documents informed the Cartons that their $700,000 had
20 been spread between the following seven policies:
21     a. Thomas Colbert AG Policy, Face Amount $3,000,000
22     b. Wanda Dean AG Policy, Face Amount $1,000,000
23     c. Kenneth Huntley AG Policy, Face Amount $1,000,000
24     d. Kenneth Huntley Aviva Policy, Face Amount $2,150,000
25     e. Leon Dean Aviva Policy, Face Amount $600,000

1         f. Samuel Diggle Aviva Policy, Face Amount $3,000,000

2         g. Gloria Rivera Americo Policy, Face Amount $1,000,000

Without exception, each policy had been executed the prior year with the first year's premium previously paid by investor(s), who were strangers to the insured.  There were six Writing Agents involved in the seven policies, and each policy named a different ILIT as a beneficiary. The Colbert Policy is unique in that AG sought a court order in 2009 to rescind the Policy for false statements in the application process. The STOLI scheme unraveled within the third year affecting all the policies in which the Cartons invested their funds.

On each of the AG applications for life insurance, the Insured failed to answer a question that asked whether the "Premium Payor" was different from the policy owner, even though a third party was providing financing for the policy. (FAC, ECF No. 43, at 26-28). On each of the Aviva applications, the Insured failed to inform Aviva of the premium financing arrangement. (*Id.*).  Promissory notes were signed by the Insured in their capacity as trustee of their ILITs promising to repay the loans obtained from the Cartons and agreeing to an interest rate of 20% per annum on those loans. (*Id.*).  This amount became payable either: (a) the day following the two year anniversary of the note; (b) the date of the death of the insured; (c) the date of any breach; or (d) the date of any default. (*Id.* at 20).

The Cartons obtained an interest in the LLCs reflecting the percentage of the funding they provided, and in August 2008 received a package containing the insurance application for each policy, the secured promissory note, the collateral assignment, and other relevant documents. (*Id.* at 16, 25).  The loans were all set to expire between June and September of 2009. (*Id.* at 27-29). However, in July of 2009, the Cartons received letters informing them that additional investors were retained to pay a third year of premiums on four of the Policies, thus decreasing the Cartons percentage interest in the Policies. (*Id.* at 25-26).  None of the Policies were sold, and apparently all of the policies have since lapsed for nonpayment. (Mot. to Dismiss, ECF No. 90 at 5).

The Cartons did not receive their principal or the guaranteed interest on their investment. (FAC, ECF No. 43 at 26-30).  The Cartons filed suit on behalf of themselves and the LLCs on May 10, 2011 against B&B, Global Equity Preservation, Inc. ("Global Preservation"); Global Equity Resources, LLC ("Global Resources"); Eagle Investment Corporation of America; Pro Financial Group, Inc. (also registered under the name Pro Fi Group); R. Koppel; Robert Eberle; Steve Koppel (a shareholder and officer of B&B) ("S. Koppel"); EPSN; Bruce Plotnick; the Insured; the ILITs who were named as beneficiaries of the Policies; Aviva; American General and Americo Financial Life and Annuity Insurance Company, among others. (Compl., ECF No. 1).

The Cartons allege Defendants B&B, Global Preservation, Global Resources, Eagle Investment, and Pro Financial Group are alter-egos of one another and operate under common ownership. (FAC, ECF No. 43 at 5).  The First Amended Complaint (the "FAC") was filed on July 12, 2011 and includes fourteen causes of action.  However, the only cause of action relating to AG and Aviva was unjust enrichment.  This claim was asserted due to the fact that AG and Aviva have retained the premiums for the policies, which have all been declared void ab initio.

AG  filed a motion to dismiss (Mot. to Dismiss, ECF No. 55) on July 28, 2011, and Aviva filed a motion to dismiss (Mot. to Dismiss, ECF No. 90) on August 2, 2011. On December 7, 2011, the Court dismissed the above Defendants without prejudice stating: "The Cartons are permitted to later add American General and Aviva as defendants so long as they can show that American General and Aviva had knowledge of sufficient facts that would have put them on at least inquiry notice that they were issuing policies to parties with uninsurable interests." (Order, ECF No. 129 at 19). On November 27, 2012, the Cartons filed a Second Amended Complaint (the "SAC"), again naming AG and Aviva in a cause of action for unjust enrichment. (SAC, ECF No. 188). The Cartons assert they have satisfied the Court's standard, set forth above, for bringing their unjust enrichment claim against AG and Aviva. They allege that Defendants were

in possession of information showing critical discrepancies in the applications with respect to third-party financing. The Cartons assert that despite the possession of this information, the Defendants nevertheless issued the policies. Thus, the Cartons contend, both Defendants AG and Aviva were on notice that they were issuing policies to parties with uninsurable interests.

Defendants American General and Aviva now move the Court to dismiss the Second Amended Complaint.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action that fails to state a claim upon which relief can be granted. A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). The court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts pertaining to his own case making a violation plausible, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009) (citing *Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). In other words, under the modern interpretation of Rule 8(a), a plaintiff must do more than specify the legal theory under which he seeks to hold a defendant liable; he also must identify the theory of his own case so that the court can properly determine not only whether any such legal theory exists, but also whether he has any basis for relief under such a theory even assuming the facts are as he alleges.

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion. However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citation omitted). Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). Moreover, under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986). Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

**III. ANALYSIS**

Before the Court are the following motions: Defendant Aviva's Motion to Dismiss Plaintiffs' unjust enrichment claim against it (Mot. to Dismiss, ECF No. 216); Defendant AG's Motion to Dismiss Plaintiffs' Second Amended Complaint ( Mot. to Dismiss, ECF No. 218); Defendant Aviva's Motion to Dismiss the First and Second Cross-Claims of Cross-Defendants Samuel L. Diggle and Diggle Irrevocable Life Insurance Trust (Mot. to Dismiss Cross-Cl., ECF No. 229); and Aviva's Motion to Dismiss the Cross-Claims of Defendant John Silvers (Mot. to

Dismiss, ECF No. 233).

**A. Unjust Enrichment Claim**

Plaintiffs have filed a SAC, (ECF No. 188), wherein they have alleged unjust enrichment of two Defendants, AG and Aviva, who were previously dismissed without prejudice. A claim for unjust enrichment requires (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the defendant; and (3) acceptance and retention of the benefit by the defendant (4) in circumstances where it would be inequitable to retain the benefit without payment. *Kabins Family LP v. Chain Consortium*, No. 2:09-CV-01125-GMN-RJJ, 2010 WL 3001890, at *6 (D. Nev. July. 27, 2010) (citing *leasepartners Corp., Inc. v. Robert L. Brooks Trust*, 942 P.2d 182, 187 (Nev. 1997)). An indirect benefit will support an unjust enrichment claim. *Topaz Mut. Co., Inc. v. Marsh*, 839 P.2d 606, 613 (Nev. 1992) (recognizing an actionable unjust enrichment claim where there was an indirect benefit conferred upon the defendant). Unjust enrichment is an equitable substitute for a contract, and an action for unjust enrichment therefore cannot lie where there is an express written agreement. *See Marsh*, 839 P.2d at 613 (citing *Lipshie v. Tracy Inv. Co.*, 566 P.2d 819, 824 (Nev. 1977); 66 Am.Jur.2d Resitution §§ 6, 11 (1973)). Here, Defendant AG argues that express, written contracts were fully performed and terminated for nonpayment, and thus, there can be no unjust enrichment. There are some problems with this argument. First, if Defendants were on notice regarding the STOLI, then they were arguably aware that they could declare the policy void and avoid performance. Additionally, the fact that each of these policies has subsequently been declared void ab initio by this Court, essentially means that each of the corresponding contracts, was ruled to be against the law. Contracts that are illegal are not merely voidable; they are void upon execution.

The SAC alleges, among other things, that AG and Aviva "accepted the benefit by receiving premium payments on the Policies from unrelated third parties, when they knew or should have known that the Policies were premium financed and issued to parties without an

insurable interest." (SAC, ECF No. 188, at 220).  Plaintiffs contend that Aviva and AG have been unjustly enriched, because they did not reimburse Plaintiffs' for the premiums they had invested into the void insurance policies, even though no claims were made against them.

The only issue to examine at this stage is whether Cartons have satisfied the Court's standard for naming AG and Aviva as Defendants in their SAC. The Court's standard was stated in the previous dismissal as follows: "The Cartons are permitted to later add American General and Aviva as defendants so long as they can show that American General and Aviva had knowledge of sufficient facts that would have put them on at least inquiry notice that they were issuing policies to parties with uninsurable interests." (Order, ECF No. 129 at 19).

AG and Aviva present several arguments for dismissing the SAC. First, Defendants assert that Plaintiffs have not pled facts describing their alleged rights under the Policies, and thus lack standing because they have no rights under the Policies.  Second, Defendants contend Plaintiffs cannot seek relief from terminated Policies, asserting that there can be no unjust enrichment claim arising from fully-performed contracts.  Third, they assert that Plaintiffs fall short of pleading facts sufficient to satisfy the Court's requirements for maintaining an unjust enrichment claim against AG and Aviva.  Specifically, they contend that Plaintiffs' claim that the insurers' alleged agents' knowledge is imputed to the insurers fails, because knowledge is not imputed when agents colluded with the insured or a third party to defraud the principal, and that such actions are outside the scope of the agents' authority. (Reply in Supp. of Mot. to Dismiss, ECF No. 227, at 2).  Finally, Defendants argue that Plaintiffs' unclean hands prohibit them from bringing an unjust enrichment claim.

The first assertion regarding standing was addressed by the Court when it denied the insurer's Rule 12(b)(1) motion to dismiss.  The Court held: "Because the Insurers continue to hold premium payments provided by the Cartons for policies which were never valid, the Cartons have suffered an injury in fact and have standing to bring this suit." (Order ECF No. 129, at 12:3-

5). Thus, this point is moot.

The second contention, that the Plaintiffs cannot seek an unjust enrichment claim from a terminated policy because the contract is fully performed, is not an accurate statement in regards to the facts of this case. Regardless of whether the contract terminated due to nonpayment of premiums, if the insurers were on notice that the policies were issued to parties with uninsurable interests, they may be found culpable, and at least partially liable for the consideration received from Plaintiffs, because they knowingly entered into contracts which have now been ruled void ab initio. If the insurers had knowledge that the contract could be voided prior to complete performance (which in the case of these Policies only could occur upon the death of the insured or termination due to nonpayment), then it is arguable that any payments received could unjustly enrich the insurer. In other words, if there is no legal detriment imposed on one of the parties to the contract, the contract is illusory. If the contract is illusory, there is a defense to formation, and therefore, the failure to return the consideration given by way of premium payments would unjustly enrich the insurers. Further, the Court has ruled the contracts void ab initio, which means they were not valid from the beginning.

Defendants' third contention, that Plaintiffs fall short of pleading facts sufficient to satisfy the Court's standard to maintain an unjust enrichment claim, is not persuasive. Plaintiffs assert that insurers' alleged agents' knowledge is imputed to AG, whereas Defendants claim this assertion fails, reasoning that knowledge is not imputed when agents colluded with the insured or a third party to defraud the principal, and that such actions are outside the scope of the agents' authority. Both assertions ultimately raise issues for the trier of fact, though the Court will address the scope of agency law in the insurance industry below. Further, as discussed below, the Court finds that the Plaintiffs, rather than falling short of pleading sufficient facts to bring a claim, have met the Court's requirements in their SAC.

///

**B. Agency Law Relating to Insurers, Agents, and Brokers**

General agency principals apply to insurance intermediaries or brokers and agents. 1 Leo Martinez et al., New Appleman Insurance Law Practice Guide § 2.03[2] (2011). A principle is bound by an agent when the agent is acting pursuant to the principal's grant of "actual" authority, even if the principle has no knowledge of the agent's actions. *Id.* at § 2.03[3](b). The extent to which a principle is bound when the agent exceeds his scope of authority depends on the facts of the case. A weighty factor in the analysis is the benefit, if any, bestowed on the principle by the agent's acts. However, when examining a particular insurance transaction, it is first necessary to establish whether an intermediary is an agent of the insurer or the insured.  Here, the parties involved include both agents and brokers. While the terms "agent" and "broker" are clearly not synonymous, an intermediary is always an agent for some party to the insurance agreement. *Id.* at 2.03[2].  It is important to identify whether the intermediary is an agent to the insured or the insurer, because this classification determines the party to whom the intermediary owes a duty. *Id.* Ultimately, the classification depends upon the facts of the particular case. *Id.*  Insurers are potentially liable for the tortious acts of their agents, when such agents act within the scope of their agency. *Id.*  On the other hand, If an intermediary is functioning as an agent for the insured, the intermediary's alleged negligence cannot be imputed to the insurance company. *Id.*  There are generally three types of recognized agents in the insurance industry.  Most commonly, the term "agent" refers to an intermediary who sells one insurance company's products exclusively and is identified and treated as an agent for the insurer. These agents are commonly described as "captive" or "exclusive" agents. *Id.* at 2.03[4].  Among these captive and exclusive agent designation are three titles with varying responsibilities, "general agents," "special agents," and "soliciting agents." *Id.*  A "general agent" sits atop the American agency system.  A general agent is an agent authorized by an insurer to accept risks, to agree upon and settle the terms of insurance policies, to issue and renew policies, and to modify or waive the terms of existing

1  policies. *Id.*  In short, a general agent has nearly unlimited authority to act on behalf of the insurer

2  who employs him. *Id.*  A "special agent" is an agent whose authority to bind an insurer is

3  expressly limited. *Id.*  Generally, these limitations are related to the types of policies the agent is

4  authorized to sell. *Id*.  A "soliciting agent" is typically limited to soliciting insurance, taking

5  applications and forwarding them to the company or its general agent. *Id.*  A soliciting agent

6  generally has no authority to bind an insurer. *Id.*  Because a soliciting agent's authority and

7  responsibility is so circumscribed, insurers and insureds may debate whether a soliciting agent's

8  knowledge can be imputed to the insurance company the agent represents. *Id.*

9         The following allegations regarding the agency of the intermediaries, and their apparent

10  authority to act in for AG are plead in the SAC.  There are three AG policies at issue in this case:

11  (1) the Colbert Policy, (2) the Dean Policy, and (3) the Huntley Policy.  Crump Insurance

12  Services, Inc. ("Crump") was appointed as a general agent for AG on each of the policies.

13  Maureen Torkelson ("Torkelson") was the writing agent on the Colbert Policy.  Robert Koppel

14  ("Koppel") was the writing agent on the Dean Policy, and Robert Burns ("Burns") was the

15  writing agent on the Huntley Policy.  Plaintiffs assert that Torkelson, Koppel, and Burns,

16  (collectively the "American General Agents" or "Writing Agents") each had a direct contractual

17  relationship with AG.  Plaintiffs assert that AG appointed each as an agent and/or producer for

18  AG, permitting and authorizing them to conduct certain business on AG's behalf.  Plaintiffs

19  contend Crump Insurance Services, Inc. ("Crump") was appointed as a general agent for AG on

20  each of the Policies. Kyle Bloss was allegedly the Crump employee who handled each of the AG

21  policies at issue in this case.  The Writing Agents allegedly submitted the applications for the AG

22  Policies through the general agent, Crump, with Crump acting as an intermediary between the

23  Writing Agents and AG.

24         The Plaintiffs have alleged that each of the Writing Agents and the General Agent,

25  Crump, had full and complete knowledge that premiums were being paid by unrelated third

parties and that all or a portion of the policies were being assigned to third parties without an insurable interest. The knowledge of an officer or agent is imputed to the corporation when the agent obtains the knowledge "while acting in the course of his employment and within the scope of his authority, and the corporation is charged with such knowledge even though the officer or agent does not in fact communicate his knowledge to the corporation." *Strohecker v. Mut. Bldg. & Loan Ass'n of Las Vegas*, 34 P.2d 1076, 1077 (Nev.1934); Restatement (Third) of Agency § 5.03 (2006); *USACM Liquidating Trust v. Deloitte & Touche LLP*, 764 F.Supp.2d 1210, 1222 (D. Nev. 2011) ("*USACM*"). The purpose of this rule is arguably to acknowledge that corporations can acquire knowledge or receive notice only through its officers and agents. *Strohecker*, 34 P.2d at 1077. This remains true even if the agents did not disclose the information to the insurers and even if the actions of the agents were adverse to the insurers. Restatement (Third) of Agency § 5.04 cmt. b (206) ("Ordinarily, an agent's failure to disclose a material fact to a principal does not defeat imputation, nor does the fact that the agent's action otherwise constitutes a breach of a duty owed the principal."); *USACM*, 746 F.Supp.2d at 1222. In *USACM*, the argument was that the agents' actions should not be imputed to the principal because the agents performed illegal acts that were clearly outside the scope of their authority. *Id.* The court rejected this argument because to hold otherwise would "eviscerate the imputation rule." *Id.* The court reasoned that a principal cannot

> escape liability for its agents' acts simply because in the course of performing acts within the scope of their employment and authority, they committed illegal or fraudulent acts. Corporations cannot insulate themselves from liability simply by proclaiming that their agents are not authorized to commit illegal acts, and thus any such acts are not imputable to the corporation.

The Ninth Circuit, has adopted the Restatement (Second) of Agency's formulation of the rule: "[t]he mere fact that the agent's primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of

1 the agent if the agent is acting for the principal's interests." *Funk v. Tifft*, 515 F2.d 23, 26
2 n. 4 (9th Cir. 1975) (citing Restatement (Second) of Agency § 282 comment c &
3 illustration 4 at 613 (1958)).

  **C. American General**

5   Plaintiffs assert that the AG Agents had full and direct knowledge at the time of
6 preparing the application materials and prior to issuance of each Policy that the premiums
7 on each policy would be paid by an unrelated third party investor who would receive an
8 interest or assignment in the Policy cash values and/or death benefits. Knowledge is also
9 imputed when the principal ratifies or knowingly retains the benefit of the agent's action.
10 Restatement (Third) of Agency § 5.04 (2006); *Nisselson v. Lernout*, 469 F.3d 143, 156-57
11 (1st Cir. 2006) ("[A] party cannot accept the avails of fraudulent conduct without also
12 bearing the responsibility for that conduct."). Plaintiffs specifically assert that "Crump
13 had full and direct knowledge at the time of preparing the application materials and prior
14 to issuance of the Colbert and Huntley AG Policies that the premiums on each policy
15 would be paid by an unrelated third party investor who would receive an interest or
16 assignment in the Policy cash values and/or death benefits." (Resp. to Reply, ECF No.
17 222, at 4). Plaintiffs assert that these agents knew the Policies were being issued to
18 individuals with no insurable interest. The degree to which these alleged agents were
19 acting in their respective authoritative capacities as agents is yet to be discovered.
20 However, Plaintiffs' pleadings certainly withstand the Rule 12(b)(6) motion for failure to
21 state a claim.
22   Further, Plaintiffs assert that during the application process and/or prior to
23 issuance of the policies, AG received copies of the trust documents creating the
24 irrevocable life insurance trusts that would own each policy. Each of these trust
25 documents is nearly identical, and each invariably states that the trustee has the power to

"borrow money for the purchase of the Policy and to provide security therefore, including an assignment of an interest in the Policy to the lender." The trust agreements go on to state: "The undersigned, as Settlor, does hereby acknowledge that its execution of this Agreement is a condition of the consummation of any financing with respect to the Policy, as identified in Article 6.(c.) of this Agreement." (*Id*. at 5). On each of the AG Policies, the first year premium was paid by an unrelated third party and received by AG prior to final policy issuance. This allegation, if true, should have put AG on at least inquiry notice of the possibility of a STOLI scheme.

Plaintiffs contend that the insurers were in a position to understand and act upon the information they possessed relating to the Policies and therefore were on notice. Though no Nevada case law directly supports this contention, rulings in other jurisdictions directly support the proposition that requiring insurers to act on the information they receive is consistent with their duty. *See Unionamerica Ins. Co., Ltd. v. Fort Miller Grp., Inc.*, 590 F.Supp.2d 1254, 1260-61 (N.D. Cal. 2008) (noting that California Insurance Code § 336 imposes a duty upon insurers "to investigate the accuracy of the information provided by the insured, if it knows or should know the information is untrue" and "a duty to ask the applicant to provide further information if it knows or should know that the application is inaccurate or incomplete") (citing *State Farm Mut. Auto. Ins. Co. v. Partridge*, 514 P.2d 123 (1973); *Ransom v. Penn Mut. Life Ins. Co.*, 274 P.2d 633 (1954)). *See also Xiong v. Lincoln Nat. Life Ins. Co.*, No. CIV. 08-345-WBS-JFM, 2009 WL 1549289, at *7 (E.D. Cal. May 29, 2009).

AG's contention that the agents acted outside their scope in writing the policies, if found to be valid, is not enough to extinguish AG's liability or counteract the knowledge of uninsurable interests, which AG should have acquired by reviewing the policies. Thus, the Court finds that these well plead allegations meet the *Twombly* standard, and that AG

should have known that the policies were possibly, if not actually, contracted with uninsurable interests.

For the foregoing reasons, the Court finds that the Plaintiffs have met their burden in their SAC, by pleading that "American General had knowledge of sufficient facts that would have put them on at least inquiry notice that they were issuing policies to parties with uninsurable interests."

### D. Aviva

The facts surrounding the issuance of the Aviva Policies so closely resemble the facts surrounding the AG Policies that the analysis is identical. For the foregoing reasons, the Court finds, as above, that the Plaintiffs have satisfied their burden in the SAC, allowing the joinder of Aviva to the Action.

### E. Motions to Dismiss ECF No. 229 and 233.

The motions to dismiss ECF No. 229 and ECF No. 233 are moot as the parties have stipulated to the dismissal of the claims and cross-claims raised in these motions to dismiss, and the Court has entered the subsequent Order. (See Stipulations of Dismissal ECF Nos. 254, 255, 257, 259, and Order on Stipulation ECF No. 260).

### CONCLUSION

IT IS HEREBY ORDERED that Defendant Aviva's Motion to Dismiss ECF No. 216 is DENIED.  IT IS FURTHER ORDERED that Defendant American General's Motion to Dismiss ECF No. 218 is DENIED.  IT IS FURTHER ORDERED that Motions to Dismiss ECF Nos. 229 and 233 are MOOT.

IT IS SO ORDERED this 10th day of September, 2013.

_____
ROBERT C. JONES
Chief Judge