UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \* \* \*

| | |
|---|---|
| EDWIN B. CARTON *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> B & B EQUITIES GROUP, LLC *et al.*, <br><br> Defendants. | CASE NO.:  2:11-cv-00746-RCJ-PAL <br><br> **[PROPOSED]** <br><br> **DEFAULT JUDGMENT** |

## DEFAULT JUDGMENT

I.  **BACKGROUND ON STOLI**

Stranger-originated life insurance ("STOLI") arrangements have become increasingly common over the past decade. *See Sun Life Assurance Co. of Canada v. Berck*, 770 F. Supp. 2d 728, 729–30 (D. Del. 2011).  In a typical STOLI scheme, a speculator collaborates with an elderly individual who has a high net worth in obtaining a life insurance policy against the life of the wealthy individual. *See generally* 3 Leo Martinez et al., *New Appleman Insurance Law Practice Guide* § 34.09[3] (2011).  The wealthy individual is often promised cash upon the future sale of the policy or enticed to enter the arrangement through the promise of two years of free life insurance. The speculator provides non-recourse financing to purchase the policy—secured by the policy—which comes due after the two-year contestability period during which the insurer has to challenge the policy. If the insured dies within the two-year contestability

period, the speculator is repaid, with interest, out of the proceeds of the policy. If the insured survives the two-year contestability period, there are two ways he or she may repay the speculator. First, the insured may pay the outstanding debt and accrued interest and retain the policy. This option is generally less attractive because the interest rates are often high or because the insured was promised a portion of the proceeds upon the sale of the policy. Second, the insured may transfer the policy to the speculator to satisfy the debt, and the speculator may then sell the policy on the secondary market. These arrangements ultimately amount to unlawful wagering and have generally been disfavored by courts. *See Berck*, 770 F. Supp. 2d at 730.

## II.     FINDINGS OF FACT & PROCEDURAL HISTORY

On March 31, 2014, this Court entered Default against Defendants Thomas E. Colbert ("Colbert"), Thomas Colbert Irrevocable Life Insurance Trust ("Colbert ILIT"), Global Equity Preservation, Inc. ("GEP"), and Eagle Investment Corporation of America ("EICOA") (collectively "Defaulted Defendants"). By operation of entry of default against Defaulted Defendants, the factual allegations asserted against them are taken as true. *Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977) ("The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.") (*citing Pope v. United States*, 323 U.S. 1, 12 (1944); *see also Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987); Fed. R. Civ. P. 8(b)(6). Therefore, in accordance with the general rule of law, the Court makes the following findings of fact[1]:

B&B Equities Group, LLC was a Nevada limited liability company whose managing members are Defendants Robert Koppel and Robert Eberle. B&B is interrelated with

---

[1] Unless noted otherwise, the facts are taken from the Second Amended Complaint, filed on November 27, 2012 as Docket No. 188, as that was the complaint in effect at the time Default was entered.

Defendants Global Equity Resources, LLC ("GER"), **Global Equity Preservation, Inc. ("GEP")**, **Eagle Investment Corporation of America ("EICA")** and Pro Financial Group, Inc. ("PFG") (collectively "B&B Entities") through common ownership, financial control and an interrelationship of operations, such that they constitute a single business in fact. The B&B Entities are entities that R. Koppel and Eberle used to operate the fraudulent scheme described herein. R. Koppel and Eberle were shareholders, managers, members, directors, officers, principals, fiduciaries, agents and/or key employees of these entities. Their duties included solicitation of the Plaintiffs to engage in the investment, payment of money towards insurance premiums, preservation of the insurance policies and/or sale of the Policies on the secondary market, provision of timely and material information to the Plaintiffs and Insurers regarding the Insureds, insurance policies and investment therein and failure to object to the B&B Entities' improper business practices. (Second Amended Complaint ("SAC") at ¶¶ 8-20, Doc. 188).

Plaintiffs Edwin and Lonnie Carton (the "Cartons") were first introduced to STOLI transactions by Defendant Bruce Plotnick, whom they met at a financial planning seminar in the early to mid 2000's. (*Id.* at ¶¶ 32-35). Plotnick was the featured lecturer at the seminar and is the principal employee and owner of Defendant Estate Planning Solution Network ("EPSN"), his financial services firm. (*Id.* at ¶ 32). Plotnick suggested the Cartons invest their retirement funds in a concept called "premium financing" through Defendant Robert Koppel ("R. Koppel") and his company B&B Equities Group, LLC ("B&B"). (*Id.* at ¶¶ 32-35).

R. Koppel and Plotnick, acting through EPSN as agent of R. Koppel, Eberle and the B&B Entities, told the Cartons that B&B would organize limited liability companies which would be assigned the rights to the life insurance policies of the insured third-parties and would assume the liabilities in funding the policies. (*Id.* at ¶ 44). The Cartons were then informed they would receive an ownership interest in these limited liability companies and were guaranteed a return of

20% on their investment. (*Id.* at ¶¶ 38-48). The Cartons were also told that the insurance premiums would be paid by the limited liability companies for a two year period, after which they would be repaid in one of two ways: (1) the insured would keep the policy and pay off the loan with interest, or (2) the insured would sell the policy on the secondary market. (*Id.*). The Cartons were under the impression that this type of transaction was legal and that the insurance company would have full knowledge of the arrangement. (*Id.*; *see also* Opp'n to Mot. to Dismiss at 9, ECF No. 113).

Koppel and Plotnick made material representations to the Cartons regarding this investment, such as:

- "there is **NO** Market Risk." (SAC at ¶ 37).
- "Unlike the Stock Market . . . this gives you security knowing that your principle is protected from Market fluctuations and your gains are sure." (*Id.*).
- "the very heart of this program is just a simple loan document where you collect . . . interest on the money you lend the insured at the end of the . . . term." (*Id.*).
- "This is a non-traditional financing method for insurance premiums, which finds itself right in line with industry standards." (*Id.*).
- "You can be assured that your money is as safe, if not safer, than being in your local bank. And compared to the Stock Market, your money is infinitely safer because your principle is protected and your money is not attached to its dangerous fluctuations." (*Id.*).

Further, Plotnick and Koppel failed to state, misrepresented or concealed the following material facts:

- The investments offered were not registered as securities with any federal or state

agency or properly noticed as securities to the Plaintiffs. (*Id.* at ¶ 169).

- The B&B Entities, Plotnick, Eberle and Koppel were not licensed securities agents/brokers/dealers with any federal or state agency. (*Id.*).

- The B&B Defendants could not guarantee that the Borrower would repay the loan or that the Policy would be able to be sold. (*Id.*).

- The amount and rate of any return was at least partially contingent on market conditions at the time of sale (*Id.*).

- At the time of the offer, the B&B Defendants had been forced to stop offering their premium financing program in the State of Pennsylvania by a Cease and Desist Order issued by the Pennsylvania Securities Commission and had been indicted for federal securities fraud in California. (*Id.* at ¶ 31).

- That Defendant R. Koppel was the insurance agent/producer responsible for facilitating the application of and/or writing at least two of the Policies. (*Id.*).

- That the Insurers would not be informed about the Premium Financing arrangement and/or Misrepresenting that the Insurer would be informed about the Premium Financing arrangement. (*Id.*).

- That the applications for insurance had material misstatements and/or omissions of material facts. (*Id.* at ¶ 32).

- That if the policy did not sell on the secondary market in two years, new investors would need to be brought in to continue the policies. (*Id.*).

- That additional investors/lenders would increase the debt burden on the Borrower/Insured and decrease the likelihood of repayment. (*Id.*).

- That additional investors/lenders would create additional liens against the Policies and decrease the value of the Policy on the Secondary Market and decrease the likelihood of a successful and profitable sale on the Secondary Market. (*Id.*).

- That an additional investors would dilute the pool of money available to the

Plaintiffs to satisfy their promised and guaranteed return in the event of sale on the Secondary Market. (*Id.*).

- The actual amount of yearly premiums on the Policies or the flexible nature of such premiums, and once disclosed, providing conflicting, contradictory and confusing information regarding the same. (*Id.*).

- The amounts, percentages or rations of origination fees, commissions, referral fees or other fees and to whom each would be paid and how they would be earned, and once disclosed, provided conflicting, contradictory and confusing information regarding the same. (*Id.*).

- The market value of the Policies on the secondary market in two years could not be known. (*Id.*).

- That on August 22, 2007, ten months before they induced the Cartons to invest, Defendants Eberle and R. Koppel were indicted by the U.S. Attorney in the Eastern District of California for securities fraud, mail fraud and money laundering in connection with the sale of investments in life insurance policies during the period 2001-2006.  The Indictment alleges that Eberle and R. Koppel committed these criminal activities using their companies, Defendants EICA and PFG.  *See* E.D. Cal. Case No. 2:07-cr-366.  These criminal proceedings were not disclosed to the Cartons by Eberle, R. Koppel or any of the B&B Entities. (*Id.* at 170). (Eberle and Koppel both recently entered plea agreements in which they plead guilty to the securities fraud count.  *See* E.D. Cal. Case No. 2:07-cr-366, Doc. 216 and Doc. 232).

- That on November 9, 2007, the Pennsylvania Securities Commission issued a press release stating that it had issued a Summary Order to Cease and Desist against Defendants PFG, EICA and R. Koppel.  According to the press release, PFG, EICA and R. Koppel had offered and sold its Premium Financing Program to Pennsylvania residents, including Promissory Notes, without necessary

registrations and disclosures required by Pennsylvania securities laws. The press release stated that PFG, EICA and R. Koppel were ordered to stop offering the Premium Financing Program in violation of state securities law and that any further offers will constitute violations of state securities law. (*Id.* at ¶ 170).

- That on March 12, 2009, the Enforcement Section of the Securities Division of the Office of Secretary of State of the State of Missouri issued an Order to Cease and Desist and Order to Show Cause against Defendants B&B, GER, GEP, R. Koppel, Banks and Eberle for offering and selling its Premium Financing program to Missouri residents in violation of state securities laws. The Missouri action was not disclosed to the Cartons until April 21, 2011 when an inquiry was made into the status of the Policies. (*Id.* at ¶ 170). (On October 25, 2011, the State of Missouri issued a Final Order finding that B&B, GER, GEP, R. Koppel and Eberle had violated Missouri securities laws and ordered them to pay restitution into an investor restitution fund.).

The Cartons relied upon these misrepresentations and were induced by Plotnick, R. Koppel, Eberle and the B&B Entities to invest in the B&B premium financing program. (*Id.* at ¶¶ 30-34). On July 16, 2008, the Cartons paid $700,000.00 to the B&B Entities through Plotnick and R. Koppel. (*Id.* at ¶ 50). The investment was spread over seven insurance policies (collectively, "the Policies"), which insured six individuals (collectively "the Insureds"). (*Id.* at ¶ 54).

One of the Policies was issued by Defendant American General Life Insurance Co. ("American General") and to the Insureds **Thomas E. Colbert** (*Id.*). Thomas Colbert is a resident of Nevada. (*Id.* at ¶ 26).

The "writing agent" on the Colbert Policy was Maureen Torkelson ("Torkelson"), an insurance agent/producer in the State of Nevada and the daughter of Defendant Colbert, the Insured on the Colbert Policy. (*Id.* at ¶ 67). Torkelson had a direct contractual relationship with American General appointing her as an agent and/or producer for American General permitting

and authorizing her to conduct certain business on American General's behalf. (*Id.* at ¶ 68). The "general agent" on the Colbert Policy was Crump Insurance Services, Inc. ("Crump"). Crump employee Kyle Bloss ("Bloss") was the sales manager and Aimee Hill, another Crump employee, was the case manager. (*Id.* at ¶ 69).

In 2007, Torkelson was approached by an acquaintance, Carl Milberg (who was also an insurance agent) telling her that he was working with a broker in writing policies that would be able to be sold at a future date and net the insured some income at time of sale. He said this arrangement was legal and her father, Colbert, would be a perfect candidate. Mr. Milberg went over to Colbert's home with Torkelson and explained to Torkelson and Colbert that an application would be filled out and sent over to Bloss at Crump. Milberg explained that Bloss would find someone to pay premiums on the policy. Milberg further explained Colbert would need to go through the medical part of the application process and if he "passed" then a policy would be issued and this was common industry practice according to Bloss. Bloss already had a company ready and willing to pay the premiums for the policy for two years. After the two years, the policy would then be sold and Colbert would get some amount of payment, to be determined based on the sale price. (*Id.* at ¶ 70).

The insurance application on the Colbert Policy was submitted by Torkelson to Bloss. (*Id.* at ¶ 71). At the time the Colbert Policy was applied for, both Colbert and Torkelson knew that a third-party lender would be providing the funding to pay the premiums in the event a policy was actually issued and that Colbert never had any intention of paying premiums on the Colbert Policy. (*Id.* at ¶ 72). In order to drive up the face value of the policy, Kyle Bloss created a financial worksheet that grossly exaggerated Colbert's financial condition. Bloss signed Torkelson and Colbert's names to the bottom of it. Neither Torkelson nor Colbert took any action to correct the false statements, despite knowledge of the same. (*Id.* at ¶ 73).

Torkelson and Colbert were not aware of who Bloss was planning on having finance the Colbert Policy when it was written. When the financing was in place, Bloss sent B&B's premium financing documents (secured promissory note, collateral assignment, etc.) to

Torkelson for Colbert to sign and have notarized. Torkelson then sent the documents back to Bloss. (*Id.* at ¶ 74). One of the documents signed by Colbert was a Secured Promissory Note that reads, in part, that the insured, as trustee of their irrevocable life insurance trust, will repay loans it receives to pay premiums on the Policy, plus origination fees and interest at fifteen percent (15%) per annum, on or before the two year anniversary date of the Policy. (*Id.* at ¶ 59). The Promissory Note required the borrower to timely pay all premiums required to keep the policy in force and to not let the Policy lapse or terminate. (*Id.* at ¶ 60). The Promissory Note was secured by a collateral assignment of the Policy to the Cartons, as lender of the premium. (*Id.* at ¶ 61-62).

Of the $700,000 invested by the Cartons with B&B, $159,800 was earmarked for the Colbert Policy as a loan to Colbert. (*Id.* at ¶ 80). Colbert benefited by receiving a year of free life insurance coverage at the Cartons' expense. (*Id.* at ¶ 82).

In 2009, AG sought a court order to rescind the Colbert Policy for false statements in the Application for Insurance. (*Id.* at ¶ 83). The Court entered a stipulated Order that the Colbert Policy is "terminated and no longer in force." (*Id.* at ¶ 84).

The two-year anniversary of the Colbert Policy was September 7, 2009. The loan to Colbert remains outstanding unpaid. (*Id* at ¶¶ 85, 87).

The other policies were similar, and the Cartons did not receive any return on their investment. (*See* SAC, generally).

On December 7, 2011, the Court entered an Order [Doc. 129] ruling that "this was a standard STOLI arrangement under which investors were in substance the true owners of the Policies, the arrangement violated public policy and the Policies were void ab initio." The STOLIs were therefore invalid and void ab initio under the respective laws or public policies of Nevada, California, Iowa, and South Carolina, in which states the STOLIs were issued.

## III. DAMAGES

The Court having found good cause to enter Default Judgment against Thomas E. Colbert ("Colbert"), Thomas Colbert Irrevocable Life Insurance Trust ("Colbert ILIT"), Global Equity Preservation, Inc. ("GEP"), and Eagle Investment Corporation of America ("EICOA"), the focus now turns to the amount of damages. The Plaintiffs asserted the following causes of actions against the Defaulted Defendants:

<u>Thomas E. Colbert</u>: (3) Actual Fraud; (6) Breach of Contract (Loan Documents); and (10) Unjust Enrichment.

<u>Thomas Colbert Irrevocable Life Insurance Trust</u>: (6) Breach of Contract (Loan Documents); and (10) Unjust Enrichment.

<u>Global Equity Preservation, Inc.; and Eagle Investment Corporation of America</u>: (1) Securities Fraud under § 10(b) of the Securities Exchange Act and SEC Rule 10b-5; (2) Securities Fraud under Nevada Revised Statutes ("NRS") section 90.660; (3) Actual Fraud; (4) Constructive Fraud; (5) Breach of Contract (B&B Investment Agreements); (10) Unjust Enrichment; and (11) Deceptive Trade Practices under NRS Chapter 598.

In determining the amount of damages, the Court notes that the investment scheme promoted by these Defendants was determined to be illegal STOLI transactions which are void ab initio under the laws of the states in which the insurance policies were issued. In such a situation, the Court will attempt to "restor[e] . . . the status quo of the parties", putting the parties as close to their original positions as is "reasonably possible and demanded by the equities of the case." *Mackintosh v. Cal. Fed. Sav. and Loan Ass'n.*, 113 Nev. 393, 407, 935 P.2d 1154, 1163 (1997). In this case, the Cartons transferred $700,000.00 to R. Koppel, which was then shared

with the defaulted defendants and various other parties. The Court will attempt to restore the Cartons to the position they occupied before the transfer of the $700,000.00.

**GEP & EICOA**

While there are likely many methods of calculating damages under the various causes of action asserted against GEP and EICOA, the most direct and straightforward way to achieve the intended result of restoring the Cartons to their original positions is by examining the remedies available under federal and state securities laws.

Nevada state law provides that a person who offers or sells a security in violation of Nevada State Securities laws "is liable to the person purchasing the security. Upon tender of the security, <u>the purchaser may recover the consideration paid for the security and interest at the legal rate of this State from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security</u>." N.R.S. 90.660(1) (emphasis added); *see Nagy v. Grobstein*, 2006 WL 2385383, *2 (D. Nev. 2006) ("Therefore, the Court finds that Grobstein should be jointly and severally liable for the amount of money paid for the unregistered securities, $300,000.00. *See* 15 U.S.C. § 77e(a)(1); Nev. Rev. Stat. 90.660(b),(f). While Defendant Grobstein complains that this is inequitable because the other defendants were never served, Grobstein never took any of the avenues available to protect his rights in this case.").

Federal law is consistent with this remedy. Under federal law, "a district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through the violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) (quotation marks and citations omitted). "[T]he amount of disgorgement should include all gains flowing from the illegal activities." *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1114 (9th Cir. 2006) (quotation marks omitted).

Whether the person retained the money or used it for other purposes is irrelevant, he or she will be liable for funds retained and funds dissipated. *JT Wallenbrock*, 440 F.3d 1109 at 1111-12. "[W]here two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they [may be] held jointly and severally liable for the disgorgement of illegally obtained proceeds." *Id.* at 1117 (citation and quotation omitted).

While these penalties may seem harsh, they are intended as a deterrent and as a means for investors to recover damages. *See* U.S. Code Cong. & Admin. News 1995, pp. 679, 687 ("The success of the U.S. securities markets is largely the result of a high level of investor confidence in the integrity and efficiency of our markets. The SEC enforcement program and the availability of private rights of action together provide a means for defrauded investors to recover damages and a powerful deterrent against violations of the securities laws"); *see also Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) ("Moreover, we repeatedly have emphasized that implied private actions provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to Commission action'").

GEP and EICOA collaborated in the STOLI scheme to induce the Cartons to invest, causing the Cartons to lose $700,000.00. The insurance policies have been determined to be illegal and void ab initio and there is no value in the Cartons' investment. The Cartons have not received any income from the investment or had any of their principal investment returned to them. The Cartons have suffered actual damages from the Defendants' actions in the amount of $700,000.00. Under the standards set forth above, the Court finds GEP and EICOA jointly and severally liable to the Cartons in the amount of $700,000.00 as a disgorgement for all gains flowing from their violations of federal and state securities laws. Because the Cartons have not received any income from the STOLI, there is no offset. Awarding the Plaintiffs this relief

satisfies the Court's goal of putting the parties as close to their original positions as is "reasonably possible and demanded by the equities of the case."

Nevada law also provides for interest at the legal rate from the date of payment, which is currently 3.25%, *see* N.R.S. 99.040(1), or $63.19 per day from July 16, 2008 (the date the Cartons transferred their money the Defendants) until repaid. As of April 9, 2014 (2093 days), the total accrued interest at the legal rate of 3.25% is $132,265.97.

**Colbert and Colbert ILIT**

Colbert and the Colbert ILIT, on the other hand, were limited in their involvement to the Colbert Policy. Their liability should likewise be limited to only that portion of the Cartons' investment related to the Colbert Policy. Under the Plaintiffs' cause of action for breach of the loan documents (*see* SAC at ¶¶ 212-215), the Plaintiffs allege that Colbert executed documents agreeing to repay the loan for the Colbert Policy with interest. Colbert and the Colbert ILIT breached the Loan Documents by failing repay the loans and/or failing to protect the Policies from lapse. This breach caused the Plaintiffs to suffer damages in the amount that the Cartons' put toward this Policy, $159,800.00. Colbert and the Colbert ILIT are jointly and severally liable to the Plaintiffs in the principal amount of $159,800.00, plus the contractual interest rate of 15%, or $14.43 per day from July 16, 2008 (the date the Cartons transferred their money to the Defendants) until repaid. As of April 9, 2014 (2093 days), the total accrued interest at the contract rate of 15% is $30,194.43.

Additionally, Nevada allows the Cartons to recover their costs and reasonable attorney's fees. According to Local Rule 54–16, a party requesting attorneys' fees must file a motion demonstrating the reasonableness of the award, an itemization and description of the work performed, an itemization of all costs, and an attorney affidavit. Plaintiffs are entitled to an

award of reasonable attorney's fees and costs and may submit such a motion complying with LR 54-16 if they choose.

## IV. JUDGMENT

Accordingly and Good Cause Appearing therefor:

IT IS ORDERED that DEFAULT JUDGMENT IS ENTERED in favor of Plaintiffs and against Defendants Global Equity Preservation, Inc. and Eagle Investment Corporation of America, jointly and severally, in the amount of $700,000.00 in principal compensatory damages, plus interest at the rate of 3.25% or $63.19 per day from July 16, 2008 until paid in full.

IT IS FURTHER ORDERED and DEFAULT JUDGMENT IS ENTERED in favor of Plaintiffs and against Defendants Thomas E. Colbert and Thomas Colbert Irrevocable Life Insurance Trust, jointly and severally, in the amount of $159,800.00 in principal compensatory damages, plus interest at the rate of 15% or $14.43 per day from July 16, 2008 until paid in full.

IT IS FURTHER ORDERED that Plaintiffs are entitled to an award of reasonable attorney's fees and costs.

DATED: This 9th day of September, 2014.

UNITED STATES DISTRICT JUDGE

Submitted By:
CHRISTENSEN JAMES & MARTIN
By: /s/ Wesley J. Smith
Wesley J. Smith, Esq.
*Attorneys for Plaintiffs*